**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHERELL HARRINGTON, DESERAE COOK, individually and on behalf of all persons similarly situated., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| UPMC and ALLEGHENY COUNTY, | ) ) |
| Defendants. | ) ) |

No. 20-cv-00497-RJC

JURY TRIAL DEMANDED

**AMENDED CLASS ACTION COMPLAINT**

I.   **INTRODUCTION**

1.      Plaintiffs Cherell Harrington and Deserae Cook each gave birth to healthy babies at hospitals owned and operated by Defendant UPMC. By choosing to have their babies at these facilities, Ms. Cook and Ms. Harrington gave UPMC access to their private medical information and trusted that UPMC would keep this information confidential. However, without their knowledge or consent, UPMC illegally gave their medical information to Defendant Allegheny County Office of Children, Youth and Families (AC-CYF).  Both UPMC and AC-CYF knew that the information UPMC supplied was confidential and provided no basis to suspect their children were at risk.  Nevertheless, AC-CYF used this confidential information to target them with highly intrusive, humiliating and coercive child abuse investigations starting before they even took their babies home.

2.      Specifically, UPMC informed AC-CYF that a single urine drug test it performed on Ms. Harrington without her knowledge or consent was "unconfirmed positive" for marijuana. It did so even though Ms. Harrington's baby was healthy and

1

tested negative for any controlled substances. UPMC knew that an "unconfirmed" drug test result was likely to be incorrect. Based solely on UPMC's provision of this confidential medical information, AC-CYF interrogated Ms. Harrington in her hospital room, subjected her to multiple home inspections, interviewed her husband and young daughter, obtained medical information from her children's pediatrician and dentist, interviewed her daughter's school counsellor, and forced her to submit to a second urine drug test and a psychological evaluation by a non-profit organization.

3.     UPMC reported to AC-CYF Ms. Cook's response to a nurse's question about marijuana use, but did so incorrectly, suggesting that she had admitted to using marijuana early in her pregnancy. In fact, Ms. Cook merely acknowledge having used marijuana before she became pregnant.  UPMC reported this incorrect information to AC-CYF even though both Ms. Cook and her baby had tested negative for any controlled substances. Based solely on UPMC's report, AC-CYF subjected Ms. Cook to multiple home inspections, interviewed her and her children's father regarding their personal lives and parenting methods, offered unsolicited and unnecessary parenting advice, and obtained confidential medical information from her children's pediatrician.

4.     The actions of UPMC and AC-CYF tarnished Ms. Harrington's and Ms. Cook's essential and irreplaceable first moments with their newborns and intruded upon the intimate sphere of family just days after their babies were born.  AC-CYF then coerced these new mothers to cooperate with baseless investigations under the implicit and terrifying threat that they could lose custody of their new babies and other children if they refused.  These actions turned the joyous experience of bringing a new baby home into a nightmare.

5.      Both UPMC and AC-CYF were acting pursuant to internal policies and procedures which routinely violated, and continue to violate, new mothers' state and federally protected rights. As a result of these illegal and unconstitutional policies, Ms. Harrington and Ms. Cook suffered emotional and psychological pain and suffering and injury to their reputations.  They bring this suit on behalf of themselves and all other new mothers in similar circumstances whose trust UPMC has violated by reporting their private medical information to AC-CYF and who, as a result that violation, AC-CYF subjected to coercive, humiliating, and intrusive child abuse investigations.

II.     **PARTIES**

6.      Plaintiff Cherell Harrington is an adult resident of Allegheny County, Pennsylvania.

7.      Plaintiff Deserae Cook is an adult resident of Allegheny County, Pennsylvania.

8.      Defendant University of Pittsburgh Medical Center is a not-for-profit corporation with a principal place of business located at 200 Lothrop Street, Pittsburgh, Pennsylvania which is duly authorized to conduct business within the Commonwealth of Pennsylvania ("UPMC").  Defendant UPMC was, at all times relevant, acting by and through its duly authorized agents, employees and/or assigns, who were then and there acting within the course and scope of their employment and in accordance with the customs, policies and practices of UPMC.

9.      Defendant Allegheny County is a Pennsylvania County of the Second Class which operates the Allegheny County Office of Children, Youth and Families ("AC-CYF"). Defendant Allegheny County was, at all times relevant, acting by and through its duly

authorized agents, employees and/or assigns, who were then and there acting within the course and scope of their employment, under the color of state law and in accordance with the customs, policies and practices of Allegheny County.

III.    **FACTS**

      **a. Plaintiff Cherell Harrington**

10.     Plaintiff Cherell Harrington is the mother of three children; a thirteen-year-old girl, a three-year-old boy and a two-year-old boy.  Prior to November 30, 2017, Ms. Harrington had never been accused of mistreating her children in any way.

11.     In or about November 29, 2017, Ms. Harrington was admitted to Magee Women's Hospital ("Magee") for the birth of her third child.

12.     Magee is a hospital owned and operated by Defendant UPMC, which purports to specialize in providing medical care to women.

13.     Following Ms. Harrington's admission, without her knowledge or consent, Magee employees collected her urine and tested it for drugs, including THC, the main psychoactive compound in marijuana.

14.     Magee had no medical reason to test Ms. Harrington's urine for drugs.

15.     Magee did not inform Ms. Harrington that it was collecting and/or testing her urine.

16.     Magee did not request or obtain Ms. Harrington's consent to collect and/or test her urine.

17.     Magee did not request or obtain Ms. Harrington's consent to report the results of her urine drug test to third parties.

18.     Magee did not disclose to Ms. Harrington that, pursuant to a plan and/or agreement between UPMC and AC-CYF, UPMC would report any positive test results to AC-CYF even if her baby was born healthy, showed no evidence of having been exposed to marijuana and tested negative for marijuana.

19.     The urine sample taken from Ms. Harrington came back "unconfirmed positive" for marijuana.

20.     The urine test results stated:

> The results are to be used only for medical purposes. ***Unconfirmed screening results must not be used for non-medical purposes (e.g., employment testing, legal testing).*** (emphasis added).

21.     The urine test results also stated:

> These tests use antibodies to detect presence of many different drugs. The tests meet standards for detecting when the indicated drugs are present for clinical testing, for clinical purposes only. ***However, the tests may react with compounds other than the drugs indicated, and therefore are not definitive. Until definitive testing confirms any result, the result should be regarded as provisional and uncertain.*** (emphasis added).

22.     UPMC knew that its urine drug tests were unreliable and likely to lead to false positive results.

23.     On November 29, 2017, Ms. Harrington gave birth to a healthy baby boy via cesarean section. She and her husband named the boy C.H.

24.     On or about November 29, 2017, without Ms. Harrington's knowledge or consent, UPMC performed a urine drug test on baby C.H.

25.     Baby C.H. tested negative for all illicit drugs, including marijuana.

26.     On or about November 30, 2017, while Ms. Harrington was recovering from surgery and caring for her newborn, a UPMC social worker entered her room and informed her that she had tested positive for marijuana.  The social worker also informed her that C.H. had tested negative.  The social worker told Ms. Harrington that the positive test result would be reported to AC-CYF.

27.     Ms. Harrington told the social worker there was no reason to report the result because it was false, and her baby had tested negative.  The social worker falsely told her she was required to report the result to AC-CYF.

28.     Although Ms. Harrington's husband was present at the hospital prior to and during C.H.'s birth and intended to return home with Ms. Harrington and C.H. following the birth, Magee did not collect or attempt to collect his urine to test it for drugs.

29.     The social worker had no reason to suspect or believe that C.H. had been the victim of abuse or neglect or was in danger of being abused or neglected.

30.     The social worker had no reason to suspect or believe that C.H. had been affected by illegal substance abuse or was having withdrawal symptoms resulting from prenatal drug exposure.

31.     On November 30, 2017, without Ms. Harrington's consent, UPMC reported Ms. Harrington's confidential unconfirmed positive test results to AC-CYF.  UPMC also reported that C.H. had tested negative and was "in good health."

32.     There was no medical necessity, reason or justification for UPMC to report any of Ms. Herrington's confidential medical information to any governmental agency, including AC-CYF.

33.     On the evening of November 30, 2017, one of the nurses attending to Ms. Harrington told her that because she had tested positive for THC, she should not breastfeed her son and that UPMC would not support or assist her in doing so.

34.     Ms. Harrington reviewed her test results on the "myupmc.com" website and discovered that the results were "unconfirmed."

35.     On December 1, 2017, less than three days after she gave birth to her son, AC-CYF caseworker Grant Walker entered Ms. Harrington's private hospital room to inform her that because of the report received from UPMC, AC-CYF was investigating her for child abuse.

36.      When Ms. Harrington objected to the investigation because the results were "unconfirmed," Walker told her that whenever UPMC reported a new mother's positive drug test to AC-CYF, AC-CYF opened an investigation.

37.     While in Ms. Herrington's hospital room, Walker photographed baby C.H. and required Ms. Harrington to sign various AC-CYF forms and documents.  He also notified her that upon discharge from the hospital, AC-CYF would subject her private residence to a "home inspection."

38.     Walker had no reason to suspect or believe that C.H. had been the victim of abuse or neglect was in danger of being abused or neglected.

39.     Walker had no reason to suspect or believe that C.H. had been affected by illegal substance abuse or was having withdrawal symptoms resulting from prenatal drug exposure.

40.     Walker had no reason to suspect or believe that Ms. Harrington's private residence was an unsuitable home for C.H.

41.     Ms. Harrington was discharged from Magee on December 2, 2017.

42.     Two days later, on December 4, 2017, Walker arrived at Ms. Harrington's home.

43.     Walker toured her house, inspected her bedroom and the children's bedrooms, looked into her refrigerator and cupboards and took photographs of her children.

44.     Walker required Ms. Harrington and her husband to answer detailed personal questions about their education, employment, family and medical histories. He asked their (then) 11-year-old daughter about her mother's "use of addictive substances."

45.     Walker told Ms. Harrington that because of the UPMC report, AC-CYF would require her to participate in a drug counselling session with a representative of Pennsylvania Organization for Women in Early Recovery ("POWER") and submit to another drug test administered by this organization at her home.

46.     Ms. Harrington objected to participating in this process.

47.     Walker told her that if she did not complete the POWER assessment, he would report her failure to cooperate to a judge and she would be required to travel to downtown Pittsburgh to perform monthly drug tests.  He did not give her any other options.

48.      Because of Walker's statement that she had to comply and because she feared losing custody of her children, Ms. Harrington submitted to the POWER assessment under duress.

49.     Neither Walker nor AC-CYF had any statutory basis to require Ms. Harrington to undergo a drug test during an investigation of child abuse or neglect.

50.     Neither Walker nor AC-CYF had any statutory or factual basis to require Ms. Harrington to submit to a psychological assessment.

51.     Neither Walker nor AC-CYF required, or even requested, that Ms. Harrington's husband undergo a drug test or psychological assessment.

52.     Walker told Ms. Harrington that following the counselling session and drug test, POWER would submit a report and recommendation to AC-CYF.  He stated that AC-CYF would follow POWER's recommendation.

53.     Walker required Ms. Harrington to sign numerous papers during the visit, but would not give her copies.

54.     Among the documents Walker required Ms. Harrington to sign were releases permitting AC-CYF to contact and obtain confidential information from her 11-year-old daughter's pediatrician, dentist and school.

55.     Ms. Harrington signed the documents because she feared that if she did not comply with AC-CYF's directives, her children would be removed from her custody.

56.     On December 5, 2017, Walker noted on an AC-CYF form that Ms. Harrington "cannot or will not control [her] behavior" and that her "protective capacity" for her children was "diminished" due, exclusively, to the "unconfirmed positive" drug test reported by UPMC.

57.     Ms. Harrington submitted a complaint to UPMC regarding the provision of her urine drug test results to AC-CYF.  In a letter dated December 11, 2017, UPMC falsely informed Ms. Harrington that "Due to Pennsylvania law, the hospital is mandated to report the information regarding the hospital screening results."

58.     On or about December 27, 2017, a POWER representative arrived at Ms. Harrington's home. The representative arrived nearly two hours earlier than her prescheduled time.

59.     The POWER representative asked Ms. Harington a series of questions about her personal life including whether she had a history of illegal drug use. On information and belief, this information was communicated to representatives from AC-CYF.

60.     The POWER representative required Ms. Harrington to submit to a second urine drug test. Ms. Harington tested negative for any illegal substances.

61.     On information and belief, the POWER representative submitted a report to AC-CYF which included Ms. Harrington's answers to POWER's questions.

62.     On December 29, 2017, a representative from POWER informed Walker that Harrington was "not recommended for treatment."

63.     Notwithstanding the POWER recommendation, on January 2, 2018, Walker contacted Ms. Harrington's daughter's school and interviewed the school social worker about Ms. Harrington's daughter.

64.     Notwithstanding the POWER recommendation, on January 4, 2018, Walker contacted Ms. Harrington's pediatrician and obtained medical information regarding her three children.

65.     Notwithstanding the POWER recommendation, on January 4, 2018, Walker contacted Ms. Harrington's dentist and obtained her daughter's dental information.

66.     Notwithstanding the POWER recommendation, on January 8, 2018, Walker returned to Ms. Harrington's home.  He again toured the home, inspected the bedrooms

and the contents of the refrigerator and kitchen cabinets.  He again interviewed her daughter.  Walker told Ms. Harrington that he would speak with his supervisor regarding the status of the investigation.

67.     Ms. Harrington received no further communications from Walker or anyone else at AC-CYF about the investigation.

### b. Plaintiff Deserae Cook

68.     Deserae Cook is the mother of two children, a 5-year-old boy and a 1-year-old girl.

69.     On July 7, 2018, Ms. Cook was admitted to UPMC Mercy ("Mercy") for the birth of her daughter.

70.     Mercy is a hospital owned and operated by Defendant UPMC.

71.     As part of the intake process, a Mercy employee asked Ms. Cook whether she had ever used illegal drugs. She responded that she had smoked marijuana in the past but "quit everything" when she found out she was pregnant.

72.     Without her knowledge or consent, Mercy employees collected Ms. Cook's urine and tested it for drugs, including marijuana.

73.     There was no medical reason for Mercy to test Ms. Cook's urine for drugs.

74.     Mercy did not inform Ms. Cook that it was collecting and/or testing her urine.

75.     Mercy did not request or obtain Ms. Cook's consent to collect and test her urine.

76.     Mercy did not request or obtain Ms. Cook's consent to report the results of her urine drug test to third parties.

77.     Mercy did not request or obtain Ms. Cook's consent to disclose her confidential medical information to AC-CYF or any other government agency.

78.     Mercy did not disclose to Ms. Cook that, pursuant to a plan and/or agreement between UPMC and AC-CYF, UPMC would report her responses to these questions to AC-CYF.

79.     The urine sample taken from Ms. Cook came back negative for any controlled substances.

80.     On July 7, 2018, Ms. Cook gave birth to a healthy baby girl named S. J.

81.     S.J.'s father, Leon Josey, was present for the birth.

82.     Mercy employees performed a drug test on Ms. Cook's newborn baby.  That drug test also came back negative for any controlled substances, including marijuana.

83.     There was no medical reason to perform a drug test on S.J.

84.     On or about July 8, 2018, an employee of Defendant UPMC entered Ms. Cook's hospital room and falsely informed her and S.J.'s father that although her drug test was negative, UPMC was "required" to report her to AC-CYF because of her answers to the intake questions.  Before that date, UPMC never informed, and/or disclosed to Ms. Cook, that her answers to the "intake questions" would be used as the basis to report confidential information to AC-CYF.

85.     On July 9, 2018, a Mercy employee contacted AC-CYF and reported that "M's tox screen was negative . . . C's tox screen was negative  . . . M admitted to using marijuana in the beginning of her pregnancy but stopped when she found out she was pregnant.  No current concerns. . . "  (ellipses represent redactions from AC-CYF's records.)

86.     Although S.J.'s father resided with Ms. Cook, was present at the hospital prior to and during S.J.'s birth and intended to return home with Ms. Cook and S.J. following the birth, Mercy did not collect or attempt to collect his urine to test it for drugs.

87.     Although S.J.'s father resided with Ms. Cook, was present at the hospital prior to and during S.J.'s birth and intended to return home with Ms. Cook and S.J. following the birth, no UPMC employee asked whether S.J.'s father had ever used illegal drugs.

88.     Based on the report from the UPMC employee, AC-CYF initiated a child abuse investigation into Ms. Cook and S.J.'s father, Leon Josey.

89.     Ms. Cook was discharged from the hospital on July 9, 2018.

90.     Sometime thereafter, AC-CYF caseworker Lindsay Hern left a note on Ms. Cook's door stating that she needed to contact the caseworker to schedule a home inspection.

91.     Ms. Cook contacted Hern and scheduled a home inspection fearing that if she did not, she could lose custody of her children.

92.     On July 24, 2018, Hern arrived at Ms. Cook's home and completed a "walk through," during which she inspected the children's bedrooms, the amount of food in the kitchen and the amount of clothing and toys the children had.  Hern interrogated Ms. Cook and the children's father about their education, employment, family and medical histories.  She also asked them about their personal lives and parenting methods, provided unsolicited parenting advice and provided them with a "parent handbook."  Hern required Ms. Cook to sign a release for both of her children's medical records.

93.     On July 25, 2018, Hern completed a "Pennsylvania Model Risk Assessment Form" in which she concluded that there was "no risk" to Ms. Cook's children.

94.     Despite Hern's finding, Ms. Cook received numerous phone calls from social services agencies offering unnecessary services for herself and her children.

95.     On August 23, 2018, Hern signed a letter informing Ms. Cook that "[her family was not accepted for services by [AC-CYF]" and that "neither further intervention nor ongoing services were needed."

96.     On August 24, 2018, despite having concluded that no "further intervention… or services were needed," Hern returned to Ms. Cook's home, conducted another unwarranted home inspection and interrogated Ms. Cook about the children's medical histories, medical insurance and recent doctor's visits.

97.     On August 27, 2018, despite having concluded that no "further intervention… or services were needed," Hern sought and obtained confidential medical information regarding both of her children from their pediatrician.

98.     Ms. Cook complained to UPMC about the unauthorized provision of her confidential medical information to AC-CYF.  UPMC never responded to her complaint.

     **c.  Defendants University of Pittsburgh Medical Center and Allegheny County Office of Children, Youth and Families.**

99.     In or about 2014, Rachel Devore filed a civil complaint against Defendant UPMC in which she alleged that UPMC violated her right to physician-patient confidentiality when it drug tested her urine without her consent and reported the "unconfirmed positive" result to AC-CYF, who then subjected her to a child abuse investigation. That litigation was resolved after the Court of Common Pleas denied UPMC's preliminary objections.

100.   At all times relevant, Defendants UPMC and AC-CYF knew that a new mother's self-report to a medical professional regarding prior drug use constituted confidential medical information which UPMC was neither privileged nor legally required to disclose to AC-CYF absent evidence that her newborn was affected by illegal substance abuse or had withdrawal symptoms resulting from prenatal drug exposure. Nevertheless, in accordance with past practices, policies, and/or agreements between the Defendants, UPMC routinely, and in bad faith, reported this confidential medical information to AC-CYF and AC-CYF routinely accepted and acted on this confidential medical information to conduct unwarranted highly intrusive, humiliating, coercive and/or unconstitutional child abuse investigations of new mothers.

101.   At all times relevant, Defendants UPMC and AC-CYF knew that a new mother's "unconfirmed positive" urine drug test result constituted confidential medical information that UPMC was neither privileged or legally required to disclose to AC-CYF absent evidence that her newborn was affected by illegal substance abuse or had withdrawal symptoms resulting from prenatal drug exposure. Nevertheless, in accordance with past practices, policies, and/or agreements between the Defendants, UPMC routinely, and in bad faith, reported this confidential medical information to AC-CYF and AC-CYF routinely accepted and acted on this confidential medical information to conduct unwarranted, highly intrusive, humiliating, coercive and/or unconstitutional child abuse investigations of new mothers.

102.   At all times relevant, Defendants UPMC and AC-CYF knew that an "unconfirmed positive" urine test result was "provisional and uncertain" and was not to be used for non-medical purposes.   Nevertheless, in accordance with past practices,

policies, and/or agreements with AC-CYF, UPMC routinely reported new mothers' "unconfirmed positive" urine drug test results to AC-CYF, and AC-CYF routinely accepted and acted upon this confidential medical information to conduct unwarranted, highly intrusive, humiliating and coercive child abuse investigations of new mothers.

103.   At all times relevant, Defendant UPMC was aware that when it reported a new mother's self-reported previous drug use and/or "unconfirmed positive" urine drug test results to AC-CYF, AC-CYF would in turn conduct an unwarranted highly intrusive, humiliating and coercive child abuse investigation including the threatened or actual removal of the mother's newborn from her custody.

104.   At all relevant times, Defendant UPMC did not report to AC-CYF positive urine drug test results or self-reported past marijuana use by men, even when it knew those men resided or would reside with newborns or very young children.

105.   At all times relevant, UPMC knew that when it reported the alleged positive urine drug test results to AC-CYF, the ensuing investigation by its social workers and AC-CYF investigators would cause Ms. Harrington to suffer emotional distress, embarrassment, humiliation and damage to her reputation.

106.   At all times relevant, UPMC knew that when it falsely reported that Ms. Cook had used marijuana while pregnant to AC-CYF, the ensuing investigation by its social workers and AC-CYF investigators would cause Ms. Cook to suffer emotional distress, embarrassment, humiliation and damage to her reputation.

107.   On information and belief, UPMC and AC-CYF mutually agreed to engage in a course of conduct that both were aware violated Ms. Harrington's and Ms. Cook's

right to privacy in their medical records, family life and home life, as guaranteed by the Fourteenth Amendment to the United States Constitution.

## IV.    CLASS ACTION ALLEGATIONS

108.    Plaintiffs bring this action as a class action pursuant to Pennsylvania Rules of Civil Procedure 1701, *et seq.*

109.    Plaintiffs seeks to represent two classes.

(a) The first class ("UPMC Class") consists of the following:

> All women who on or after March 11, 2018, were subjected to urine drug test while admitted to a UPMC facility for the purpose of giving birth, whose newborns tested negative for controlled substances and whose urine drug test results or other medical information related to substance use was disclosed to Allegheny County Office of Children Youth and Families.

(b) The second class ("AC-CYF Class") consists of the following:

> All new mothers who, on or after March 11, 2018, were subjected to investigation by the Allegheny County Office of Children Youth and Families based solely on reports of past marijuana use or a urine drug test that tested positive for marijuana.

110.    The requirements of Pa. R. Civ. Pro. 1702(1) are satisfied with regard to both classes in that estimates that there are at least 100 class members whose interests would be affected by any order of declaratory or injunctive relief.  The number of class members is so large that joinder of all its members is impracticable.

111.    The requirements of Pa. R. Civ. Pro. 1702(2) are satisfied in that there are questions of law and fact common to the classes, including but not limited to:

(a) Whether, by disclosing Plaintiffs' urine drug test results or other medical information related to substance use to

Defendant Allegheny County, Defendant UPMC breached its duty to protect UPMC Class members' confidential medical information in violation of Pennsylvania law.

(b) Whether, by cooperating to report and investigate urine drug test results and/or self-reported prior drug use of new mothers, but not similarly situated men, Defendants , UPMC and Allegheny County entered into a combination, agreement, or understanding to violate Plaintiffs' Fourteenth Amendment rights to equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

(c) Whether by cooperating to report and investigate new mothers' urine drug test results and/or self-reported prior drug use, in the absence of any legal obligation or privilege to do so, Defendants UPMC and Allegheny County entered into a combination, agreement, or understanding to violate Plaintiffs' Fourteenth Amendment rights to privacy.

112.    The requirements of Pa. R. Civ. Pro. 1702(3) are satisfied in that Plaintiffs' claims are typical of the claims of the class.  Plaintiffs and all class members are seeking injunctive relief and damages under Pennsylvania law. Any finding that that Defendants' conduct violated Plaintiffs' rights will be applicable to all class members.

113.    The requirements of Pa. R. Civ. Pro. 1702(4) and 1709 are satisfied in that Plaintiffs will fairly and adequately assert and protect the interests of the class in that:

(a) Plaintiffs have no conflict of interest in the maintenance of the class action; and

(b) Plaintiffs has adequate resources to assure that the interests of the class will not be harmed; and

(c) Plaintiffs' attorneys, Margaret S. Coleman, Esq., and the Law Offices of Timothy P. O'Brien, and Sara Rose, Esq and the American Civil Liberties Union of Pennsylvania will fairly and adequately represent the interests of the class in that: (i) they have done significant work in identifying and investigating potential claims prior to filing this action; (ii) they and their respective firms have extensive experience litigating class actions, other complex litigation and the

types of claims asserted in the Class Action Complaint; (iii)
they have extensive knowledge of the applicable law; and
(iv) they are advancing the costs of the litigation.

114.    The requirements of Pa. R. Civ. Pro. 1702(5) and1708(a) are satisfied in

that prosecuting separate actions by individual class members would create a risk of

inconsistent or varying adjudications with respect to individual class members that would

establish incompatible standards of conduct for the party opposing the class; and/or

adjudications with respect to individual class members that, as a practical matter, would

be dispositive of the interests of other members not parties to the individual adjudications

or would substantially impair or impede their ability to protect their interests.

115.    The requirements of Pa. R. Civ. Pro. 1702(5) and1708(b) are satisfied in

that the parties opposing the class have acted or refused to act on grounds that apply

generally to the class so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole.

### V.    CLAIMS

### COUNT I

### Breach of Physician-Patient Confidentiality

### Harrington, *et al* v. UPMC

116.    In admitting Cherell Harrington, Deserae Cook and other putative class

members ("Plaintiffs") as patients at UPMC facilities and undertaking to provide them with

medical care, UPMC owed a duty to Plaintiffs, recognized by Pennsylvania common law,

to keep all communications, diagnoses and treatment information completely confidential.

117.    UPMC breached this duty with regard to Cherell Harrington by disclosing to

AC-CYF the results of her urine drug test.

118.    UPMC breached this duty with regard to Deserae Cook by disclosing confidential information she had communicated to it for the purpose of seeking medical treatment.

119.    The information disclosed by UPMC falsely portrayed Plaintiffs as abusers of illegal drugs, and thus had a tendency to blacken Plaintiffs' characters.

120.    As a direct and proximate result of UPMC's actions, Plaintiffs suffered harm, including but not limited to, emotional and psychological pain and suffering and injury to their reputations.

121.    UPMC's conduct violated Plaintiffs' right under Pennsylvania law to physician-patient confidentiality.

122.    Defendant UPMC's conduct was outrageous, willful and/or recklessly indifferent to Plaintiffs' rights.


## COUNT II

### Fourteenth Amendment Substantive Due Process—Violation of Right to Be Free from Government Intrusion into Family Privacy Including the Birth of a Child


### Harrington, *et al.* v. UPMC and Allegheny County

123.    Defendants UPMC and Allegheny County, through its Office of Children Youth and Families, acting in concert with one another, followed a practice, and/or entered into an agreement or understanding to violate Cherell Harrington's, Deserae Cook's and other putative class members' ("Plaintiffs'") Fourteenth Amendment substantive due process right to be free from government intrusion into family privacy including upon the birth of a child.

124.   AC-CYF, by virtue of a custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, acquiesced in and/or has otherwise authorized its caseworkers to violate citizens' constitutional rights by initiating unwarranted, highly intrusive, humiliating and coercive child abuse investigations into new mothers and their families. These investigations include but are not limited to; government social workers carrying out, in some instances on the day of birth or shortly thereafter, unannounced, non-consensual entries into the birth mother's hospital room where the birth mother  is notified that she is suspected of child abuse and subject to a child abuse investigation; carrying out unjustified, often unannounced, and coercive whole home inspections begun within days of the birth of the newborn; interrogation of children in the household including questions about their parents' activities and conduct; coercive demands to provide bodily fluid samples, including urine samples; and the prying into and demand to allow government social workers and/or investigators to have unfettered access to confidential personal and other family members medical records.

125.   At all times relevant, UPMC was aware that its actions, carried out in concert with AC-CYF, including but not limited to its unwarranted disclosure of personal confidential medical information to AC-CYF, would result in the violation of the Plaintiffs' Fourteenth Amendment right to be free from government intrusion into family privacy including upon the birth of a child.

126.   Allegheny County and UPMC acted intentionally to deprive Plaintiffs of their constitutional rights under the Fourteenth Amendment, or acted in wanton, reckless disregard of those rights.

127.    Allegheny County's and UPMC's actions were taken in deliberate indifference to Plaintiffs' constitutional rights under the Fourteenth Amendment to be free from government intrusion into family privacy including upon the birth of a child.

128.    Plaintiffs assert these claims pursuant to 42 U.S.C. § 1983.

129.    Plaintiffs have suffered substantial harm as a result of Defendants' conduct, including but not limited to, emotional and psychological pain and suffering and injury to their reputations.

## COUNT III

## Fourteenth Amendment Due Process—Violation of Right to Privacy in Personal and Confidential Medical Records

## Harrington, *et al.* v. UPMC and Allegheny County

130.    Upon information and belief, Defendants UPMC and Allegheny County, through its Office of Children Youth and Families, acting in concert with one another entered into an agreement or understanding to violate Cherell Harrington's, Deserae Cook's and other putative class members' ("Plaintiffs'") Fourteenth Amendment substantive due process right to privacy in their confidential personal medical records.

131.    Defendants UPMC and Allegheny County each acted in furtherance of this agreement or understanding.  Defendant UPMC had a policy specifically requiring its employees to report to AC-CYF unconfirmed positive urine drug test results and/or self-reported prior drug use under circumstances where it was not privileged or legally required to do so.  AC-CYF encouraged UPMC to continue violating Plaintiffs' rights by accepting records which it knew UPMC was not privileged or legally required to disclose

and, based exclusively on these records, initiating unwarranted highly intrusive, humiliating and coercive child abuse investigations.

132.   The aforementioned conspiracy violates 42 U.S.C. § 1983.

133.   Defendants UPMC and Allegheny County acting in concert with one another deprived Plaintiffs of their constitutional rights under the Fourteenth Amendment, or acted in wanton, reckless disregard of those rights.

134.   Defendants' actions were in deliberate indifference to Plaintiffs' constitutional rights under the Fourteenth Amendment.

135.   Plaintiffs assert these claims pursuant to 42 U.S.C. § 1983.

136.   Plaintiffs have suffered substantial harm as a result of Defendants' conduct, including but not limited to, emotional and psychological pain and suffering and injury to their reputations.

## COUNT IV

### First Amendment

### Harrington v. Allegheny County

137.   AC-CYF's threat to report Ms. Harrington to a judge and require her to submit to monthly drug tests, despite the absence of any evidence that she had abused or neglected any of her children, unless she participated in the POWER program, which required her to answer a series of questions about her personal life, violated Ms. Harrington's right to be free from compelled speech, a right protected by the First Amendment to the U.S. Constitution.

138.    Upon information and belief, AC-CYF, by virtue of a custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, authorizes its caseworkers to act in an unconstitutional fashion by threatening women with adverse consequences unless they participate in a drug counseling program, in violation of their right to be free from compelled speech, based solely on a hospital report that they had an unconfirmed positive test for marijuana while pregnant and despite the lack of any evidence that the women have abused or neglected their children.

139.    Defendant Allegheny County, through the actions of its Office of Children, Youth and Families, violated Plaintiff's rights under the First Amendment to the United States Constitution. Plaintiff asserts this claim pursuant to 42 U.S.C. § 1983.

140.    Plaintiff has suffered substantial harm as a result of Defendants' conduct, including but not limited to, emotional and psychological pain and suffering and injury to her reputation.

**COUNT V**

**Fourteenth Amendment Equal Protection—Sex Discrimination**

**Harrington _et al._ v. UPMC and Allegheny County**

141.    Upon information and belief, Defendant UPMC entered into an agreement, or understanding and/or otherwise acted in concert with Defendant Allegheny County to violate Cherell Harrington's, Deserae Cook's and other putative class members' ("Plaintiffs'") Fourteenth Amendment right to Equal Protection of the Laws.

142.    UPMC and Allegheny County, through AC-CYF, each acted in concert with one another and in furtherance of this agreement or understanding.

143.   Defendant UPMC had a policy or practice of collecting information from new mothers regarding their prior drug use, but had no policy or practice of collecting such information about prior drug use by these women's male partners or other similarly situated men (i.e., men likely to have custody of a newborn or very young child.)

144.   Defendant UPMC had a policy or practice of collecting and drug testing the urine of new mothers but had no policy or practice of collecting and drug testing the urine of these women's male partners or other similarly situated men.

145.   Defendant UPMC had a policy or practice of reporting to AC-CYF unconfirmed positive urine drug test results and/or self-reported prior drug use of new mothers, but had no similar policy or practice of reporting drug test results or self-reported prior drug use of these women's male partners or other similarly situated men.

146.   Defendant UPMC reported new mothers' confidential medical information to AC-CYF with the understanding and intent that AC-CYF would use this information to conduct child-abuse investigations into these new mothers.

147.   AC-CYF had a policy and practice of accepting and acting on confidential information it received from UPMC, knowing that the information was being collected only from new mothers and was not being collected from similarly situated men.

148.    Both UPMC and AC-CYF understood and intended that new mothers, but not similarly situated men, would be investigated for abusing or neglecting the children under their care based exclusively on an unconfirmed positive urine drug test and/or a self-report of prior drug use.

149.   Both UPMC and AC-CYF intended to subject new mothers, but not similarly situated men, to unwarranted highly invasive, burdensome, humiliating and/or

unconstitutional child abuse or child neglect investigations based exclusively on an unconfirmed positive urine drug test and/or a self-report of prior drug use without any basis to suspect or believe that their babies had been affected by illegal substance abuse or were having withdrawal symptoms resulting from prenatal drug exposure.

150.   Neither UPMC nor AC-CYF had any basis to believe that mothers of newborns whose urine tested position for drugs or who self-reported prior drug use were more likely than similarly situated men to abuse or neglect the children under their care when there was no basis to suspect or believe that their babies had been affected by illegal substance abuse or were having withdrawal symptoms resulting from prenatal drug exposure.

151.   Defendants UPMC and Allegheny County, through the actions of its Office of Children, Youth and Families, violated Plaintiff's rights under the Equal Protection clause of the Fourteenth Amendment. Plaintiffs assert these claims pursuant to 42 U.S.C. § 1983

152.   Plaintiffs have suffered substantial harm as a result of Defendants' conduct, including but not limited to, emotional and psychological pain and suffering and injury to their reputations.

## Count VI

## Fourth Amendment

## Harrington v. Allegheny County

153.   AC-CYF required Ms. Harrington to submit to a urine drug test in violation of her Fourth Amendment rights.

154.   Upon information and belief, AC-CYF, by virtue of custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, authorizes its caseworkers to act in an unconstitutional fashion by requiring women to submit to a urine drug test without statutory authorization based solely on a hospital report that they had an unconfirmed positive test for marijuana while pregnant and without any basis to believe that the women have abused or neglected their children.

155.   Defendant Allegheny County, through the actions of its Office of Children, Youth and Families, violated Plaintiff's rights under the Fourth Amendment to the United States Constitution. Plaintiff asserts this claim pursuant to 42 U.S.C. § 1983

156.   Plaintiff has suffered substantial harm as a result of Defendants' conduct, including but not limited to, emotional and psychological pain and suffering and injury to her reputation.

**Count VII**

**Pa. Const. art. I, Sec. 8**

**Harrington v. Allegheny County**

157.   AC-CYF required Plaintiff to submit to a urine drug test in violation of her right to privacy under Art. I, Sec. 8 of the Pennsylvania Constitution.

158.   Upon information and belief, Defendant AC-CYF, by virtue of a custom, pattern, practice, policy and/or failure to appropriately train and/or discipline, authorizes its caseworkers to act in an unconstitutional fashion by requiring women to submit to a urine drug test without statutory authorization based solely on a hospital report that they

had an unconfirmed positive test for marijuana and without any basis to believe that the women have abused or neglected their children.

159.    Defendant Allegheny County, through the actions of its Office of Children, Youth and Families, violated Plaintiff's rights under Art. I, Sec. 8 of the Pennsylvania Constitution.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    Certify pursuant to Pa. R. Civ. Pro. 1702, *et seq.* a class of all women who on or after March 11, 2018, were patients of UPMC, who were admitted to a UPMC facility for the purpose of giving birth, who were subjected to urine drug test, whose results were "unconfirmed positive," whose newborns tested negative, whose results were disclosed to Allegheny County Children and Youth Services and who were thereafter subjected to AC-CYF investigation.

(b)    Certify pursuant to Pa. R. Civ. Pro. 1702, *et seq.* a class of all new mothers who, on or after March 11, 2018, were subjected to investigation by the Allegheny County Office of Children Youth and Families based solely on reports of past marijuana use or a urine drug test which tested positive for marijuana.

(c)    Award declaratory and injunctive relief in favor of Plaintiffs and the Class and against Defendants;

(d)    Award to Plaintiffs and the class punitive damages against Defendant UPMC.

(e)    Award to Plaintiffs and against Defendants compensatory damages, attorneys' fees and costs, and

(f)     Award such other relief as this Court deems necessary and proper.

Respectfully submitted,

THE LAW OFFICES OF TIMOTHY P. O'BRIEN

/s/ Margaret S. Coleman
Margaret S. Coleman
Pa. ID No. 200975

535 Smithfield Street, Suite 1025
Pittsburgh, PA  15222
(412) 232-4400

and

ACLU OF PENNSYLVANIA

/s/ Sara J. Rose
Sara J. Rose
Pa. ID No. 204936
Witold J. Walczak
Pa. ID No. 62976

P.O. Box 23058
Pittsburgh, PA 15222
(412) 681-7864