IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHERELL HARRINGTON, et al          )
                  Plaintiffs,          )
                           )
v.          )          Case 2:20-cv-497-RJC
                           )
UPMC and ALLEGHENY COUNTY,          )
                  Defendants.          )

## Brief in Support of Allegheny County's Motion to Dismiss the Amended Complaint

### Introduction

The Amended Complaint avers that UPMC reported suspected child abuse and then "CYF interrogated Ms. Harrington in her hospital room, subjected her to multiple home inspections, interviewed her husband and young daughter, obtained medical information from her children's pediatrician and dentist, interviewed her daughter's school counsellor, and forced her to submit to a second urine drug test and a psychological evaluation by a non-profit organization" based solely on UPMC's provision of unreliable confidential medical information provided to it, Amended Complaint, ECF Doc. 17, ¶ 2.

Substantially the same allegations are made with respect to Desarae Cook, except that the information that that UPMC reported to CYF was that Ms. Cook informed a nurse that she used marijuana early in her pregnancy and she was not interviewed in the hospital by a CYF caseworker.[1] *Id.* at ¶ 4. Ms. Cook and her child's drug test results were both negative.

---

[1] The Amended Complaint pleads that Cook said she stopped using marijuana when she learned that she was pregnant.

## Allegations in the Amended Complaint

Harrington is the mother of three children ages 13, 3, and 2. *Id.* at ¶ 10. She was admitted to Magee Hospital on November 29, 2017 for childbirth. *Id. at* ¶ 11. Hospital staff collected a urine sample without her knowledge or consent and tested it for drugs, including THC. *Id. at* ¶ 13. Harrington asserts that Magee Hospital had no medical reason to test her for drugs. *Id. at* ¶ 14. The hospital did not disclose that drug tests were being conducted or that the results would be reported to a third-party. *Id. at* ¶ 15-17. Harrington alleges there is a plan or agreement between UPMC and CYF to report positive drug tests to CYF even if the baby is healthy, there is no evidence that the mother was a drug user, and that the baby tested negative for drug. *Id. at* ¶ 18. Harrington's urine sample was positive for THC. *Id. at* ¶ 19 But the drug test that was used by Magee Hospital was not to be used for legal purposes and the results are tentative. *Id. at* ¶¶ 20–21. UPMC knows that this test gives false positives. *Id. at* ¶ 22.

On November 30, 2017, UPMC informed Harrington that her drug test was positive and that the results would be reported to CYF. *Id. at* ¶ 26. Harrington's husband, who was at the hospital, was not tested for drugs. *Id. at* ¶ 28. UPMC had no reason to suspect the plaintiff or her children were being abused. *Id. at* ¶ 29. The same day UPMC reported to CYF that (1) the plaintiff had a positive drug test; (2) the plaintiff's baby had tested negative for drugs; (3) the baby was in good health. *Id. at* ¶ 31. After the plaintiff was informed of her positive drug test, she saw on the UPMC website that her test was unconfirmed. CYF case worker, Grant Walker, came to plaintiff's room that day and informed her that he was investigating her for child abuse. Informed her that whenever UPMC reports a positive drug test (for the mother of a newborn) CYF opens a child

2

abuse investigation. *Id. at* ¶ 36. Harrington signed documents for Mr. Walker, and he told her that he would conduct a home investigation upon her discharge from UPMC. *Id. at* ¶¶ 36–40. Other than the positive drug test, Mr. Walker had no reason to suspect child abuse or that the plaintiff's home was unsuitable. *Id. at* ¶¶ 36 – 40.

Plaintiff was discharged from UPMC-Magee on December 2, 2017. The same day Mr. Walker conducted an inspection of the plaintiff's home and "required" her and her husband to answer questions regarding their education, employment and medical history. Mr. Walker also ask plaintiffs 11-year-old daughter about her parents' drug use. Walker told the plaintiff that she would have to participate in drug counseling session with POWER[2] and have a drug test at her home. *Id. at* ¶ 45. When the plaintiff objected, Walker said that if she did not agree, he would report that to the judge and she would have to come downtown for a drug test. *Id. at* ¶ 47. Harrington complied with Walker's demands because of his threats. *Id. at* ¶ 48.

She also pleads that's CYF had no basis to demand that she submit to drug test or any of its other demands, and that CYF did not demand that her husband be drug tested. *Id. at* ¶¶ 49-55. Walker is alleged to have reported that plaintiff cannot control her behavior and that her capacity to care for her children was diminished due to the "unconfirmed" drug test. *Id. at* ¶ 56.

POWER required the plaintiff to submit to drug test and it reported the results to CYF. Walker also contacted the plaintiff's child's school and ask about plaintiffs' daughter. *Id. at* ¶ 63. Walker also obtained medical and dental records of the plaintiff's

---

[2] POWER is an acronym for the social service agency, Pennsylvania Organization for Women in Early Recovery.

children. *Id. at* ¶¶ 64-65. On June 8, 2018, Walker toured the plaintiff's home. He told

the plaintiff that he would discuss the investigation with his supervisor. *Id. at* ¶ 66.

Harrington heard nothing more from Walker. *Id. at* ¶ 67.

**Desarae Cook**

 Ms. Cook is the mother of a one-year-old and a five-year-old child. *Id. at* ¶ 68.

On July 7, 2018 she was admitted to UPMC Mercy hospital for childbirth. *Id. at* ¶ 69.

Ms. Cook was asked by hospital staff about drug use upon her admission to the hospital.

Ms. Cook said that she had smoked marijuana, but she quit when she learned she was

pregnant. *Id. at* ¶ 71. UPMC collected Ms. Cook's urine and tested for drugs without her

knowledge or consent that it was to be used for a drug test. *Id. at* ¶ 72. Ms. Cook's urine

drug test was negative. *Id. at* ¶ 79. The results of the test were disclosed to CYF. *Id. at* ¶¶

72-78.

 On July 7, 2018 she gave birth to a healthy baby. *Id. at* ¶ 80. The father of Ms.

Cook's baby was present at the hospital but he was not given a drug test. *Id. at* ¶ 81. Ms.

Cook's baby was also tested for drugs and the results were negative. *Id. at* ¶ 82. There

was no medical reason to test Ms. Cook's baby for drugs. *Id. at* ¶ 83.

 Hospital staff told Ms. Cook that it was required to report her answers to the drug

questions to CYF. *Id. at* ¶ 84. Factually correct information was given to CYF by UPMC

about Ms. Cook's answers and the test results. *Id. at* ¶ 85. The baby's father was not

tested or questioned about his drug use. *Id. at* ¶¶ 86-87. CYF initiated a child abuse

investigation regarding her drug use. *Id. at* ¶ 88.

 Ms. Cook was discharged from UPMC on July 9, 2018. *Id. at* ¶ 89. Lindsay Hern,

a CYF caseworker, left a note at Ms. Cook's home requesting a home inspection. *Id. at* ¶

90. Ms. Cook scheduled the home inspection. *Id. at* ¶ 91. Ms. Hern required Ms. Cook and the child's father to sign medical releases for her children during that home visit. *Id. at* ¶92. Ms. Hern completed a Pennsylvania Model Risk Assessment Form, which produced a finding of "no risk." *Id. at* ¶ 93. Afterwards, Ms. Cook received numerous phone calls from social service agencies offering services. *Id. at* ¶ 94. Ms. Hern informed Ms. Cook that she was not accepted for services and no further services or intervention were needed. *Id. at* ¶ 95. Ms. Hern returned to Ms. Cook's home on August 24, 2018 and conducted a home inspection. She asked questions about the children's medical histories, insurance and doctor visits. *Id. at* ¶ 96. On August 27, 2018 CYF obtained medical records from the children's pediatrician. *Id. at* ¶ 97. Ms. Cook complained to UPMC about it providing medical information to CYF without her authorization. *Id. at* ¶ 98.

In 2014 UPMC was sued by a Ms. Rachel Devore who alleged that it violated patient confidentiality by reporting an unconfirmed positive drug test to CYF. The case was settled after preliminary objections were denied in the Allegheny County Common Pleas Court. *Id. at* ¶ 99. UPMC routinely reports and CYF routinely accepts confidential medical information and then conducts child abuse investigations. *Id. at* ¶ 100.  CYF knew that the test results were confidential and that UPMC was not privileged or required to report those test results to it. *Id. at* ¶ 101. CYF knew that the drug test results were "provisional and uncertain." *Id. at* ¶ 102. UPMC and CYF have agreed to this conduct and they were aware that it violated the privacy and family life rights of the plaintiff protected by the 14th amendment. *Id. at* ¶ 107.

**The Proposed Class.**

The Proposed Class consists of mothers who are reported to CYF by UMPC based on unconfirmed drug tests or on past marijuana use. The parameters of the class are not relevant to this motion.

**Plaintiffs' Legal Claims- Counts 1-8**

The Plaintiffs' complaint is divided into the following seven counts:

Count One names only UPMC and claims that it violated patient confidentiality under state law. *Id. at* ¶¶ 116–122.

Count Two names UPMC and Allegheny County and claims they violated plaintiffs' substantive due process right to be free of government intrusion her family privacy under the Fourteenth Amendment to the Constitution of the United States of America (Fourteenth Amendment) and 42 U.S.C. §1983 (Section 1983) by.

    1. failing to train and discipline their employees,

    2. authorizing or acquiescing in the alleged violations,

    3. visiting new mothers' room on the day of birth,

    4. conducting unannounced and coercive home inspections,

    5. interrogating parents and children,

    6. conducting unauthorized drug testing, and

    7. accessing private medical records.

*Id. at* ¶124.

Count Three names UPMC and Allegheny County. It claims those defendants violated plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States to privacy of their medical information because UPMC required its

employees to report unconfirmed test results to CYF. CYF encouraged this conduct by UPMC and used the unconfirmed drug test result to initiate investigations. *Id. at* ¶131.

Count Four makes a claim only as to Ms. Harrington. It alleges that Allegheny County violated the First Amendment, by compelling the Plaintiff Harrington to answer questions posed by CYF caseworkers using the implied threat that her children would be removed from her care, if she failed to cooperate. *Id. at* ¶ 137.

Count Five makes claims that Allegheny County and UPMC violated Plaintiffs' right to equal protection of the law under the Fourteenth Amendment because only the mothers of children are drug tested and questioned about their drug use. *Id. at* ¶¶ 142–152.

Count Six only names Ms. Harrington as a plaintiff. It alleges that Allegheny County required her to submit a urine test without statutory authority based on an unconfirmed drug test conducted by the hospital in violation of her Fourth Amendment Right to be free from unreasonable searches. *Id.* at ¶ 154

Count Seven is against Allegheny County only. It alleges that the County required Ms. Harrington to submit to drug test without probable cause in violation of Article 1, Section 8 of the Pennsylvania Constitution. *Id. at* ¶¶ 157-159.

The relief demanded by the plaintiffs is for the Court to,

      1. grant unspecified declaratory and injunctive relief, and

      2. award compensatory damages, attorneys' fees and costs.

### Claims Under 42 U.S.C. § 1983

42 U.S.C. § 1983 does not itself create substantive rights but, rather, provides a statutory vehicle for the vindication of rights that have been established by the U.S.

Constitution and/or laws.  *Godfrey v. Adamo*, 2014 WL 3453846, 3 (W.D.Pa., filed July 15, 2014).  In general, to state a claim under Section 1983, a plaintiff must allege facts showing the following events:

> a.  she was deprived of a right secured by the Federal Constitution or laws; and

> b.  a person acting under color of state law committed that deprivation of right.

*Daniels v. Taylor*, 2014 WL 3955372, 2 (D.N.J., filed August 13, 2014).

If, however, the plaintiff seeks to state a claim against a governmental unit (rather than an individual person), additional principles apply.  More particularly, a governmental unit (*e.g.*, Allegheny County) is not subject to civil rights liability under Section 1983 by virtue of acts of its employees or representatives—*i.e.*, under a theory of *respondeat superior*.  *Monell v. Department of Soc. Servs. of City of New York,* 436 U.S. 658, 98 S. Ct. 2018 (1978).  Instead, the governmental unit may be subject to municipal liability only if the plaintiff proves that an official governmental policy or custom caused a constitutional violation.  *Id.*  There must be a direct causal link between the policy or custom and the constitutional deprivation.  *City of Canton v. Harris*, 489 U.S. 378, 385-86, 109 S.Ct. 1197 (1989).  Along these lines, the plaintiff must show that the government unit, through deliberate conduct, was the moving force behind the claimed injury.  *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also City of Canton*, 489 U.S. at 389 (stating that the plaintiff must show the government maintained the policy or custom with deliberate indifference to the constitutional violation).  In short, the plaintiff must prove an official policy or custom, a constitutional violation and causation.  *Bryan County*, 520 U.S at 404.

A municipal policy is a "statement, ordinance, regulation, or decision officially

adopted and promulgated by that body's officers." *Brown v. Muhlenberg Twp.,* 269 F.3d 205, 215 (3d Cir.2001) (quoting *Monell,* 436 U.S. at 690, 98 S.Ct. 2018). "A custom, on the other hand, need not have received formal approval through official decision-making channels, but it "must have the force of law by virtue of the persistent practices" of municipal officials." *Monell*, supra at 690–91, 98 S.Ct. 2018

Once a §1983 plaintiff identifies a municipal policy or custom, she must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. at 404. If, as here, the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Id.* at 407, 117 S.Ct. 1382 (citations omitted); *see also Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

### The Pennsylvania Child Protective Services Law

CYF's actions in this case were taken pursuant to its duty under the Pennsylvania Child Protective Services Law ,23 Pa.C.S. §§ 6301-6385, and Pennsylvania Department of Human Services regulations. 55 Pa. Code § 3490.1*et seq.,* which provide for detailed and comprehensive requirements for reporting, investigating and remedying child abuse.

The state, as *parens patriae*, has the duty to care for its more dependent citizens, especially young people who are without the requisite parental supervision. *Janet D. v.*

*Carros,* 240 Pa. Super. 291, 315, 362 A.2d 1060, 1072 (1976). [3] Child welfare agencies are bound by CPSL and departmental regulations. *Id.*

The term "child abuse" is defined as an act or failure to act that causes or creates an imminent risk of serious physical or mental injury to a child. *Id.* § 3490.4. Child abuse also includes serious physical neglect constituting "prolong or repeated lack of supervision or the failure to provide essentials of life, including adequate medical care, which in dangers a child's life or development or impairs the child functioning." *Ibid*.

The county agency is <u>solely</u> responsible for receiving and investigating reports of suspected child abuse. *Id.* § 3490.5 (c). Any person may report suspected child abuse to ChildLine or a county agency. *Id.* §  3490.1 (a). ChildLine is a unit of the Pennsylvania Department of Welfare that operates a toll-free telephone line for the purpose of receiving reports of suspected child abuse.  *Id.* § 3490.4. Required reporters[4] are required to report <u>suspected</u> child abuse to ChildLine. It is a potential felony criminal offense for a required reporter to fail to report suspected child abuse. 23 Pa. C. S. A. § 6319. Required reporters who work in an institution must report suspected child abuse to their superiors, who must report to ChildLine. *Id.* § 3490.13.

Reports of abuse to ChildLine must be verbally and immediately submitted to the county agency. The county agency must conduct and is responsible for submitting a report of its investigation to ChildLine within 30 days. *Id.* § 3490.32 (a), (e).  The county agency must begin its investigation and see the child within 24 hours of its receipt of a

---

[3] This case was decided under the Juvenile Act, Act of December 6, 1972, P.L. 1464, As amended, repealed by Section 2(a) (1460) of the Judiciary Act Repealer Act (JARA), Act of April 28, 1978, P.L. 202. A similar provision is now found in the Juvenile Act, 42 Pa.C.S. § 6321(a), which was succeeded by the CPSL.
[4] Required reporters are also referred to as "mandated reporters."

report and it must begin its investigation immediately if an emergency custody authorization is needed or if it cannot determine if an emergency custody authorization is needed. *Id.* § 3490.55.

### The Plaintiffs have failed to plead a cause of action for violation of their substantive due process rights under the Fourteenth Amendment.

The Plaintiffs demand that the court find Allegheny County violated their substantive due process rights under the Fourteenth Amendment because CYF caseworkers initiated and conducted an investigation based on a suspicion that they were using marijuana during pregnancy or near the time of birth. The Plaintiffs were never deprived of legal or physical custody of their children.  There is no allegation that either caseworker threated Plaintiffs with any such deprivation or interference by the caseworkers. Ms. Harrington alleges Caseworker Walker told her that he would "report her failure to cooperate to a judge and she would be required to travel to downtown Pittsburgh to perform monthly drug tests.  He did not give her any other options". ECF Doc.17, ¶ 47. She pleads that she submitted to the POWER assessment because of what he said and because "she feared losing custody of her children . . ." *Id. at* ¶ 48. Ms. Cook does not allege Ms. Hern made any threat. Ms. Cook pleads that she feared that she might lose custody of her child if she did not cooperate.

The question of whether a substantive due process claim is stated when CYF has not taken or restricted a parent's care, custody and control of her children was the issue in *A.J. v.  Lancaster County*, 2019 WL 5102156 (E.D. Pa., October 11, 2019) (*A.J. (1)*), 2019 WL 7161686 (December 23, 2019) (*A.J. (2)*), appeal filed January 30, 2020).  The facts and the legal issues are analogous to the instant case.  Plaintiff A.J. asserted substantive and procedural due process claims.  *A.J. (2)* at p. 3.  The substantive claim

was based on Lancaster County, through its child welfare agency, allegedly ignoring exculpatory evidence that a child's leg fracture was accidental and coercing a safety plan. (A safety plan is a nominally voluntary agreement between a person suspected of child abuse and child welfare agency regarding care and custody of a child.) These claims were against the county directly or individual defendants in their official capacity, which are really claims against the county.[5] In *A.*J. (1), the court dismissed the procedural and substantive due process claims without extended discussion, but granted plaintiffs leave to amend.  In *A.J. (2)* the court dismissed those claims with prejudice.  *A.J. (2)* It acknowledged a parent has a fundamental interest in the care, custody and control of their children and this is a protected interest. *Id.* at pp. 2-3.  However, *A.J. (2)* dismissed the substantive due process claim finding that "a parent's fundamental liberty interest in the care, custody and management of his or her child is not implicated by conduct short of actual separation of parent and child."  *Id.* at p. 13.  See, *Rinderer v. Delaware Cty. Children Youth Services,* 703 F. Supp. 38, 361 (E.D. Pa. 1987) (no due process claim exists when there is no separation of parent and child.)  *Coleman v. State of New Jersey Div. Of Youth and Family Services,* 267 F. Supp. 2nd 384 (U.S.D.C. N.J. 2000) (threats and poor judgment by a caseworker without separation of parent and child does not state a due process claim); *Billups v. Penn State Milton S. Hershey Medical Center*, 2017 WL 9485536 (M.D. Pa. 2017) (No substantive due process claim is stated without separation

---

[5] Claims against government employees in their official capacities duplicate Plaintiff's municipal claims against Allegheny County. *See Monell v. Dep't. of Soc. Serv. Of City of New York*, 436 U.S. 658, 690 n.558 S.Ct. 2018 (1978) (indicating official-capacity claims are merely alternate ways of pleading an action against a municipality); *Blair v. City of Pittsburgh*, 2015 WL 4162400, 4 (W.D.Pa., July 9, 2015) (dismissing official-capacity claims as duplicative of *Monell* claim against a municipal defendant).

of parent and child, even though there existed a safety plan) See also, *Falkner v. Reeves*, 1992 W.L. 96268 (E.D. Pa. 1992),  *Rudolph Ali v. Steelton Police Department*, 2016 WL 11270010, p. 11 (M.D. Pa. 2016).

Two cases from the Western District of Pennsylvania also support dismissal of the substantive due process claim in Count 2, even though both found a plausible claim against a child welfare agency because in both instances a parent's children were removed from their custody by the agency. The facts in *Bower v. Lawrence County Children's Youth Services*, 2011 WL 5523712 (W.D. Pa. November 14, 2011) arise from Bower being admitted to Jameson Health Center (Jameson) for delivery her baby. On the day she went into labor, Ms. Bower had a salad with dressing that contained poppyseeds. Jameson performs urine drug screens on all obstetrical patients. The preliminary drug screen is performed, followed by a confirmatory drug screen if the preliminary test is positive. Bower' preliminary drug screen was deemed positive even though it was below Jameson's reference range. A confirmatory test was then performed. The result on that test was "no reference range," which means that it was almost undetectable. Bower's baby's test was negative. Bower alleged there was "no reason to believe that [her baby] had been the victim of child abuse." Jameson notified LCYS of Bower's positive drug test. LCYS did not investigate whether the test result was a false positive, nor did it conduct any other investigation before obtaining an *ex parte* court order taking custody of Bower's baby on the basis that he "had been exposed to drugs." *Id.* at p. 2. LCYS then literally took Bower's baby from her arms. Her baby was not returned her for 75 days. Bower filed an action under Section 1983 claiming a substantive due process violation and that LCYS and Jameson conspired to violate her constitutional rights. LCYS filed a

motion to dismiss, which the court denied as to the substantive due process allegation and granted as to the allegation of a conspiracy. *Bower* denied the motion holding that LCYS should have conducted an individualized assessment of the facts and circumstances before taking custody of Bower's baby.  The same result was reached in a similar case by a different District Judge in *Mort v. Lawrence County Children and Youth Services*, 2011 W.L. 3862611 (W.D. Pa. August 31, 2011). Both cases held that the law does not require a child welfare agency to either ignore suspected child abuse or to take custody of the child. What is required is a reasonable individualized investigation before it takes that action.  The holdings of both *Bower* and *Mort* are that a child welfare agency commits a substantive due process violation if it takes custody of a child without conducting a reasonable investigation.

Here the Plaintiffs allege that conducting an investigation on what they perceive to be insufficient evidence before and without taking custody of a child is a substantive due process violation. LCYS argued in *Bower* and *Mort* that it was placed in a *"Catch 22"* situation. It could be liable if it did not take a child and it was being abused or if it did take a child and it was not being abused. Both *Bower* and *Mort* rejected this argument, holding that there was a third way. LCYS should have conducted a reasonable investigation before taking custody of a child. Here, it is even closer to "Catch 22." CYF can be liable for not taking custody of a child, for taking custody of a child, and for conducting an investigation that is later deemed to be unreasonable. No doubt, Plaintiffs will argue the alternative is not to conduct an investigation based on insufficient evidence. Accepting for argument purposes that the grounds for suspicion were weak they were not nonexistent. Substantive due process requires government conduct that

shocks the conscience, which is ". . .conduct intended to injure in some <u>way unjustifiable by any government interest</u> . . ." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (emphasis added). No one can gainsay that there is a strong government interest investigate suspected child abuse, even though the suspicion is weak.

Moreover, the Plaintiffs' relationship with their children and their family was not interfered with in any material sense beyond an investigation. The inconvenience and emotional distress of being the subject of a child abuse investigation is far outweighed by the risk of actual child abuse going undiscovered and unremedied. CYF received a complaint of suspected abuse from a reputable medical provider. It investigated the report.  After CYS conducted the investigation required by the CPSL, it concluded that the report was unfounded and took no further action.

Count 2 of the Amended Complaint must be dismissed for failure to state a cause of action.  Moreover, because the basis for dismissal cannot be cured, it should be dismissed with prejudice.

**Equal Protection does not require Allegheny County to investigate fathers for potential child abuse based on illegal drug use when it has not received a complaint about the fathers and there is no information that they were using drugs or abusing any child.**

Section 1 of the Fourteenth Amendment to the Constitution of the United States of America provides,

> . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Equal protection requires that government treat persons standing in the same relation to a governmental action uniformly. *Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.

Ct. 1362, 1383 (1964) However, "the Constitution does not require things which are different in fact * * * to be treated in law as though they were the same.' *Tigner v. State of Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882*, Rinaldi v. Yeager*, 384 U.S. 305, 309, 86 S. Ct. 1497, 1499–500, 16 L. Ed. 2d 577 (1966).

In this case the Plaintiffs are pregnant women, who were admitted to a hospital to give birth. The hospital conducted a drug test and Ms. Harrington's test was positive for marijuana. Ms. Cook informed the hospital that she had used marijuana, but stopped when she learned she was pregnant. Those facts were reported to CYF. The Plaintiffs argue that those facts are insufficient to justify CYF investigating, but they cannot argue that there were <u>no facts</u> justifying the investigation.  This is a material difference between the mothers and the father. The Amended Complaint does not refer to a single fact known to CYF that the fathers were using or had used any illegal drug.  Neither of the fathers were tested for drug use or admitted using any drug, and the fathers were not patients of the hospital.

The Plaintiffs argue that Allegheny County should have tested the fathers because the mothers were tested for drug use, but Allegheny County tested no one. The Plaintiffs were tested by UPMC when they were admitted to the hospital <u>as patients</u>. The fathers were not admitted to the hospital and they were not tested. Furthermore, the Amended Complaint does not proffer any mechanism by which Allegheny County could require them to be tested, nor any reason why it could have suspected them of using drugs or child abuse.

The Amended Complaint asserts that CYF began its investigation of the mothers based on insufficient evidence of marijuana use. No such evidence existed regarding the

16

fathers. They were not therefore in the same relationship to the government and they were different in fact from mothers who were admitted to the hospital, and the hospital had some evidence of drug use that it reported to CYF.

Count 5 of the Amended Complaint must be dismissed for failure to state a cause of action.  Moreover, because the basis for dismissal cannot be cured, it should be dismissed with prejudice.

### *Monell* liability of Allegheny County cannot be established.

A claim under Section 1983 against a governmental unit (*e.g.*, Allegheny County) rather than an individual person, cannot be stated through the acts of its employees or representatives—*i.e.*, under a theory of *respondeat superior*.  *Monell v. Department of Soc. Servs. of City of New York, supra*.   The Plaintiffs have stated as a conclusion in their complaint that actions by Caseworkers Grant Walker and Lindsey Hern were conducted pursuant to policies or customs of Allegheny County and that it failed to properly train them.  It is possible to infer from the Amended Complaint that Plaintiffs allege that the policy or custom is that CYF conducts an investigation without first verifying the information in the report, but the purpose of the investigations is to verify or rule out suspected child abuse.

As a general rule, a municipal defendant like Allegheny County cannot be liable under Section 1983 if none of its employees are liable in his or her individual capacity. *Fagan v. City of Vineland*, 22 F.3rd 1273, 1292 (3rd Cir. 1994). *Fagan* announced a very

limited exception to the general rule.[6] To the extent that the exception to this general rule applies here, the Plaintiffs have still failed to state a cause of action.

For a municipal defendant to be liable under the *Fagan* standard its employees would have to have been following a municipal policy that was deliberately indifferent to a citizen's constitutional rights. *Estate of Thomas v. Fayette County*, 194 F. Supp. 3rd 358, 378 (W.D. Pa. 2016), citing, *City of Los Angeles v Heller*, 475 U. S. 796, 106 S. Ct. 1571 (1986). In other words, a municipality can be liable only if its employees were "merely the conduit for causing constitutional harm" because of a deliberately indifferent municipal policy. *Estate of Thomas*, 194 F. Supp. 3d at 378, quoting *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3rd Cir. 2003). In other words, in circumstances where an employee who does not realize that his conduct is unconstitutional and enforces an unconstitutional municipal policy that shock the conscience. *Id.* at 379. The holding in *Fagan* addresses the situation when a deliberately indifferent municipal policy "dictated the injury causing action, as distinct from the situation in which the municipal policy merely allowed the [employee] to violate a plaintiff's constitutional rights." *Estate of Thomas*, 194 F. Supp. 3d at 380.

For the reasons previously discussed above, the investigation of suspected child abuse without taking custody of the child does not shock the conscience. The County cannot, therefore, he liable under any theory of liability as to the substantive due process claim in Count 2. The same argument applies to the claims against Allegheny County in Counts 4-6. There is nothing about asking to inspect the homes where children live or

---

[6] The exception is limited to its facts – a high speed police chase.) *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3rd Cir. 2003)

asking for authorizations to view medical other records or asking a parent to submit to a drug test as part of the investigation that establishes a policy or custom by the County that is deliberately indifferent to the Plaintiffs' constitutional rights. The County was pursuing a legitimate government function -- the protection of children. The clear goal of the County, as mandated by the CPSL and its regulations was to ascertain that the suspicions of child abuse that were reported to it by UPMC were groundless.   Its methods, even if wrong do not shock the conscience of make a plausible claim that is was deliberately indifferent.

> **No claim for monetary damages is recognized for violation of the Pennsylvania Constitution.**

Plaintiff Harrington asserts a claim for violation of Article I, Section 8 of the Pennsylvania Constitution. Pennsylvania does not recognize monetary damage claims for violations of its Constitution. *Kornegey v. City of Philadelphia*, 299 F. Supp. 3d 675, 685 (E.D. Pa. 2018), citing *Jones v. City of Phila.*, 890 A.2d 1188, 1208 (Pa. Commonwealth. Ct. 2006).

Wherefore, the Defendants respectfully request that the Court dismiss any monetary damage claims asserted in Count 7 of the Plaintiffs' Complaint.

## Conclusion

Allegheny County respectfully demands that the court dismiss Counts 2, 4,5, and 6. It also demands that any claim for monetary damages or attorneys' fees be dismissed as to Count 7.

**Respectfully submitted,**

s/ John A. Bacharach,
Allegheny County Assistant Solicitor
300 Fort Pitt Commons Building
445 Fort Pitt Boulevard
Pittsburgh, PA 15219
(412) 350-1150
john.bacharach@AlleghenyCounty.us