**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

CHERELL HARRINGTON, DESERAE )    No. 20-cv-00497-RJC
COOK, individually and on behalf of all )
persons similarly situated, )
                     )    JURY TRIAL DEMANDED
           Plaintiffs, )
                     )
       v. )
                     )
UPMC and ALLEGHENY COUNTY, )
                     )
           Defendants. )

**OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE FIRST AMENDED COMPLAINT**

**I)    INTRODUCTION**

Defendants UPMC and Allegheny County collaborated in a joint effort to identify new mothers who used marijuana while pregnant and target them for child abuse investigations.  This joint effort resulted in arbitrary and intrusive investigations of Plaintiffs' families in the days and weeks following the births of their children despite all available evidence indicating that their newborns were not at risk of child abuse or neglect. UPMC's role in this joint effort was to perform urine drug screens for marijuana on the Plaintiffs without their knowledge or consent when they arrived at the hospital to give birth and to turn over *any* information in their medical records to the Allegheny County Children, Youth Office of and Families that related to prenatal marijuana use, including drug-test results and self-reports of marijuana use early in pregnancy.

Allegheny County not only accepted the confidential medical information that UPMC reported to it, but used it as a basis to target Plaintiffs for child-abuse

investigations.   Because the reports by UPMC were the sole basis for Allegheny County's decision to target these new mothers for child abuse investigations, the County did not have an objectively reasonable suspicion of child abuse sufficient to justify the intrusion into Plaintiffs' families.

Plaintiffs' allegations regarding UPMC and Allegheny County's joint efforts to identify new mothers who used marijuana while pregnant and target them for child abuse investigations state a claim for the violation of Plaintiffs' Fourteenth Amendment rights to familial privacy, medical privacy, and equal protection.   Plaintiffs' allegations that Allegheny County required Ms. Harrington to participate in drug-counseling and submit to a drug test as part of its baseless investigation state a claim for the violation of Ms. Harrington's First Amendment right to be free from compelled speech and her Fourth Amendment right to be free from unreasonable searches.   Finally, Plaintiffs' allegations that UPMC disclosed their confidential medical information to AC-CYS without justification state a claim for the violation of Plaintiffs' right to physician/patient confidentiality. Accordingly, the Defendants' motions to dismiss should be denied.

## II)   <u>SUMMARY OF FACTUAL ALLEGATIONS</u>

Plaintiffs Cherell Harrington and Deserae Cook each gave birth to healthy babies at hospitals owned and operated by Defendant UPMC. By choosing to have their babies at these facilities, Ms. Cook and Ms. Harrington gave UPMC access to their private medical information and trusted that UPMC would keep this information confidential. However, without their knowledge or consent, UPMC illegally gave their medical information to Defendant Allegheny County Office of Children, Youth and Families (AC-CYF).   Both UPMC and AC-CYF knew that the information UPMC supplied was

confidential and provided no basis to suspect their children were at risk.  Nevertheless, AC-CYF used this confidential information to target Ms. Harrington and Ms. Cook with highly intrusive, humiliating and coercive child abuse investigations starting before they even took their babies home.  ECF # 17 at ¶ 1.

UPMC informed AC-CYF that a single urine drug test it performed on Ms. Harrington without her knowledge or consent was "unconfirmed positive" for marijuana. It did so even though Ms. Harrington's baby was healthy and tested negative for any controlled substances. UPMC knew that an "unconfirmed" drug test result was likely to be incorrect. Based solely on UPMC's provision  of this confidential medical information, AC-CYF interrogated Ms. Harrington in her hospital room, subjected her to multiple home inspections, interviewed her husband and young daughter, obtained medical information from her children's pediatrician and dentist, interviewed her daughter's school counsellor, and forced her to submit to a second urine drug test and a psychological evaluation by a nonprofit organization.  Id. at ¶ 2.

UPMC reported to AC-CYF Ms. Cook's response to a nurse's question about marijuana use, but did so incorrectly, suggesting that she had admitted to using marijuana early in her pregnancy. In fact, Ms. Cook merely acknowledged having used marijuana before she became pregnant.  UPMC reported this incorrect information to AC-CYF even though both Ms. Cook and her baby had tested negative for any controlled substances. Based solely on UPMC's report, AC-CYF subjected Ms. Cook to multiple home inspections, interviewed her and her children's father regarding their personal lives and parenting methods, offered unsolicited and unnecessary parenting advice, and obtained confidential medical information from her children's pediatrician. Id. at ¶ 3.

The actions of UPMC and AC-CYF tarnished Ms. Harrington's and Ms. Cook's essential and irreplaceable first moments with their newborns and intruded upon the intimate sphere of family just days after their babies were born.  AC-CYF then coerced these new mothers to cooperate with baseless investigations under the implicit and terrifying threat that they could lose custody of their new babies and other children if they refused.  These actions turned the joyous experience of bringing a new baby home into a nightmare.  Id. at ¶4.

Both UPMC and AC-CYF were acting pursuant to internal policies and procedures that routinely violated, and continue to violate, new mothers' state and federally protected rights. As a result of these illegal and unconstitutional policies, Ms. Harrington and Ms. Cook suffered emotional and psychological pain and suffering and injury to their reputations.  Plaintiffs have brought this lawsuit on behalf of themselves and all other new mothers in similar circumstances whose trust UPMC has violated by reporting their private medical information to AC-CYF and who, as a result of that violation, were subjected to coercive, humiliating, and intrusive child abuse investigations by AC-CYF.  Id. at ¶5.

### III)    <u>ARGUMENT</u>

> ***A. UPMC and AC-CYF were not legally required to use Plaintiffs' confidential medical information to initiate baseless child abuse investigations.***

Plaintiffs allege that Defendants UPMC and AC-CYF violated their rights under the United States Constitution, the Pennsylvania Constitution and state common law.  Both UPMC and AC-CYF have moved to dismiss Plaintiffs' Complaint.  Both principally contend that Plaintiffs' claims should be dismissed because the Child Protective Services

Law ("CPSL") 23 Pa. C.S.A. § 6301, *et seq,* required them to take the actions they did. This contention, with regard to both UPMC and AC-CYF, is fundamentally flawed.

i. The CPSL did not require UPMC to disclose Plaintiffs' confidential marijuana use information to AC-CYF.

UPMC argues repeatedly in its brief that it is not liable for disclosing Plaintiffs' confidential marijuana use information because it was only fulfilling legal duties imposed by the CPSL. See, e.g., ECF # 19 at 1,7, 9, 11, 13-15, 17-20. Specifically, UPMC alleges that its disclosures were required by 23 Pa. C.S.A § 6311 and § 6386.

23 Pa. C.S.A. § 6386 directly and clearly states under what circumstances a medical provider is required to report information concerning maternal drug use. At the time of the events giving rise to Plaintiffs' Amended Complaint, § 6386 provided that health care providers who are involved in the delivery or care of an infant who is "born and identified as being affected by . . . illegal substance abuse by the child's mother" or "withdrawal symptoms resulting from prenatal drug exposure" must make a report to the appropriate county agency. Id. (emphasis added).[1]

By its terms, this section of the statute does not require UPMC to make a report every time it suspects a new mother may have used drugs during her pregnancy. Rather, the statute requires a report only if the newborn has been "identified as being affected by illegal substance abuse." The word "affected" is not defined in the statute. "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." Sebelius v. Cloer, 569 U.S. 369, 369 (2013) (quoting BP America

---

[1] Section 6386 was amended in October of 2018. Neither the version of the statute in effect when Plaintiffs gave birth, nor the current version, require disclosure of maternal drug use information under the circumstances presented in this case.

Production Co. v. Burton, 549 U.S. 84, 91 (2006)).  According to Miriam Webster, to "affect" is to "to produce a material influence upon or alteration in."  Thus, the statute mandates reporting only where UPMC has ascertained that "illegal substance abuse" has "produce[d] a material influence upon or alteration in" a newborn.  Here, UPMC was aware that Plaintiffs' babies were healthy, had no symptoms of withdrawal, and had tested negative for controlled substances.  UPMC had no basis to suspect that they had been "affected by illegal substance abuse" and thus was not required to make a report under 23 Pa. C.S.A. § 6386 .

Likewise, § 6311 imposed no duty on UPMC to disclose Plaintiffs' confidential information. Section 6311 requires "mandated reporters," including hospitals, to report "suspected child abuse . . . if the mandated reporter has reasonable cause to suspect that a child is a victim of child abuse . . ."  The statute does not require a mandated reporter to make a report absent "reasonable cause to suspect . . . child abuse*."*

UPMC argues that when Ms. Harrington's urine screen came back "unconfirmed positive" for THC and when Ms. Cook reported using marijuana before she discovered she was pregnant, it had an "'objectively reasonable suspicion' of abuse that necessitated reporting to AC-CYF."  ECF # 19 at 14. UPMC could not have had an objectively reasonable suspicion of abuse based on this information because the use of illicit substances while pregnant *is not child abuse*. In the Interest of L.J.B., 199 A.3d 868 (Pa. 2018).

Moreover, UPMC could not have reasonably suspected Plaintiffs were abusing their children because the information in its possession would not even arguably fall within the CPSL's definition of "child abuse."  "Child abuse" is defined as:

(i) Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.

(ii) An act or failure to act by a perpetrator which causes nonaccidental serious mental injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

(iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

(iv) Serious physical neglect by a perpetrator constituting prolonged or repeated lack of supervision or the failure to provide essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning.

23 Pa.C.S. § 6303

UPMC had no reason to believe that Plaintiffs' healthy babies had been victims of any of the above-listed behaviors simply because their mothers might have used marijuana while pregnant.

Because no section of the CPSL required UPMC to report Plaintiffs' marijuana use information to AC-CYF, its contention that it was merely fulfilling its duties under that act is without merit.

ii. The CPSL did not require AC-CYF to investigate the information it received from UPMC.

AC-CYF similarly argues that it subjected Plaintiffs to child abuse investigations pursuant to its duty under the CPSL and its implementing regulations, which provide "detailed and comprehensive requirements for reporting, investigating and remedying child abuse" ECF # 21 at 9.  AC-CYF overstates the extent of its duties under this law.

The CPSL only requires a county agency to investigate complaints of "child abuse." 23 Pa. C.S.A. § 6334.1.  As explained *supra*, UPMC's reports were *not* reports of

suspected child abuse under the CPSL's definition.  At most, UPMC's reports could be viewed as referrals for "other protective services." <u>See</u> <u>id</u>. The CPSL does not authorize, let alone require, AC-CYF to conduct detailed and invasive investigations when it receives a referral for "other protective services."  <u>Id</u>.

When a county agency receives a referral for "other protective services," it is tasked only with "assess[ing] the needs of the child . . ." <u>Id</u>.  Thus, AC-CYF was authorized to do no more than "assess" whether Plaintiffs' newborns needed services. It was immediately apparent from UPMC's reports that these babies did not need anything. The newborns were healthy and tested negative for controlled substances. There was no information suggesting their parents were in any way unfit or incapable of caring for them. Thus, AC-CYF's assessment of these reports should have been "no services needed," and Plaintiffs should have been permitted to nurture and bond with their babies without governmental interference.  AC-CYF was absolutely not statutorily required to subject to these women to ongoing, intrusive child abuse investigations.

### B. AC-CYF's intrusive and baseless child abuse investigations violated Plaintiffs' Fourteenth Amendment right to familial privacy.

The existence of a "'private realm of family life which the state cannot enter' 'has its source . . . not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" <u>Duchesne v. Sugarman</u>, 566 F.2d 817, 824-25 (2d Cir. 1977) (quoting <u>Prince v. Massachusetts</u>, 321 U.S. 158, 166 (1944); <u>Smith v. Organization of Foster Families for Equality and Reform</u>, 431 U.S. 816 (1977) (internal quotations omitted)).  "The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres

to the requirements of procedural and substantive due process." Croft v. Westmoreland Cty. Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997).

"[A] state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. Accordingly, in determining whether governmental interference in a familial relationship violates substantive due process, the focus "is [on] whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with the rights as parents. Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power." Id. "Reasonable suspicion is lacking when a child welfare agency has 'consciously disregarded a great risk that there had been no abuse.'" Mulholland v. Gov. Cty. of Berks, 706 F.3d 227, 241 (3d Cir. 2013) (quoting Ziccardi v. City of Philadelphia, 288 F.3d 57, 66 (3d Cir. 2002)).

Requiring new mothers to submit to intrusive investigations, including home inspections and coerced drug counseling, or risk losing custody of their children, implicates their rights under the Fourteenth Amendment. See Croft, 103 F.3d at 1126. To determine whether a constitutional violation has occurred, the intrusiveness of the investigation must be balanced against the risk to the child based on the information available to the caseworker. Id. In Croft, a county caseworker threatened to remove a child from her parents' custody and place her in foster care unless the father agreed to leave home and stay away from his daughter until the investigation was complete. Id. at 1124. The court concluded that the information available to the caseworker (". . . a six-

fold hearsay report by an anonymous informant . . . ") did not justify the degree of interference with the parents' rights.

Other courts have similarly held that unwarranted child abuse investigations violated parents' Fourteenth Amendment rights. In Doe v. Heck, the U.S. Court of Appeals for the Seventh Circuit held that, in the absence of any evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, caseworkers violated the parents' right to familial relations by, *inter alia*, investigating the plaintiff parents as child abusers—even though the parents were never separated from their children.  Id. at 524.  According to the court, the "unquestionably compelling state interest" in protecting children "may not be used as a pretense for arbitrary governmental intrusion into the private affairs of its citizens."  Id. at 525.

The U.S. Court of Appeals for the Sixth Circuit recently held that the government had no basis for interfering with a new mother's parenting of her son where the mother's pre-delivery urine drug test was unconfirmed positive for opiates but both the baby's test and a confirmatory test of the mother were negative.  Schulkers v. Kammer, 955 F.3d 520, 530 (6th Cir. 2020).  In Schulkers, child welfare caseworkers told the mother that she could not have any unsupervised contact with her children due to the initial positive drug test.  Id. at 528.  Although the caseworkers did not separate the mother from her children, the Sixth Circuit held that the supervision restrictions the agency imposed violated the mother's clearly established Fourteenth Amendment right to the care and custody of her children because they "contravened 'the traditional presumption' articulated by the Supreme Court in Troxel 'that a fit parent will act in the best interest of his or her child.'"  Id. at 540 (quoting Troxel v. Granville, 530 U.S. 57, 69 (2000)).

Similarly here, the information available to AC-CYF did not justify its substantial interference in Plaintiffs' right to parent their children without interference.  In Ms. Harrington's case, the information available to AC-CYF was a report from UPMC that 1) a urine drug screen performed on Ms. Harrington shortly before she gave birth was "unconfirmed positive" for marijuana, and 2) her baby was healthy and tested negative for any controlled substances.  ECF # 17 at ¶¶ 31-40.  Based solely on this information, an AC-CYF caseworker showed up at her hospital room to inform her that she would have to submit to a home inspection.  Id. ¶ 37.  During the home inspection, the case worker toured her home, inspected her and her children's bedrooms, looked in her cupboards, interrogated her oldest child outside of her presence, took photographs of her children, and required her to answer detailed personal questions.  The caseworker also required Ms. Harrington to participate in drug counseling and submit to a another drug test, again based on nothing more than the UPMC report that a urine drug screen performed on Ms. Harrington was "unconfirmed positive" for marijuana.  Id. ¶ 45.

In Ms. Cook's case, AC-CYF had even less information to justify its intrusion into her family life.  All AC-CYF had was a report from UPMC that she had reported using marijuana before she found out she was pregnant, but that both she and her baby had tested negative. UPMC reported "no current concerns."   Id. ¶¶ 85, 88.  Based solely on this information, an AC-CYF caseworker required Ms. Cook to submit to multiple home inspections, asked her detailed personal questions, provided unsolicited parenting advice, and obtained her children's medical records.  Id. ¶¶ 91-97.

Although Defendants contend that there can be no Fourteenth Amendment violation for deprivation of parental rights unless the caseworkers' actions cause the

parent and child to be physically separated, that is not the law.  The U.S. Supreme Court has held that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children" Troxel, 530 U.S. at 66, including the right to raise children as they choose[2] and to make decisions about their children.[3]  "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."  Troxel, 530 U.S. at 68-69.

The Third Circuit's decision in Croft is consistent with the Supreme Court's concern for familial privacy.  Although the court stated that the "right to familial integrity … does not include a right to remain free from child abuse investigations," its opinion demonstrates that it did not intend to immunize such investigations from constitutional scrutiny.  Croft, 103 F.3d at 1125.  According to Croft, courts "must balance the fundamental liberty interests of the family unit with the compelling interests of the state in protecting children from abuse."  Id.  Any "disruption or disintegration of family life … as a result of the county's child abuse investigation does not, in and of itself, constitute a constitutional deprivation," but when the state lacks "reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent

---

[2] See Meyer v. Nebraska, 262 U.S. 390 (1923) (statute forbidding teaching of German language impermissibly encroached on Fourteenth Amendment liberty interest in "the right to marry, establish a home, and bring up children).

[3] See Wisconsin v. Yoder, 406 U.S. 205 (1972) (compulsory education law violated father's rights to take children out of school to complete their education at home); Troxel, 530 U.S. 57  (statute authorizing judges to order parents to permit visitation with non-parents violated parent's Fourteenth Amendment rights).

danger of abuse," such disruption can give rise to a violation of the parent's Fourteenth Amendment rights.  Id. at 1126; see Heck, 327 F.3d at 520  ("[A]lthough child welfare caseworkers may investigate allegations of child abuse without violating parents' constitutional right to familial relations, they may not do so arbitrarily.") (citing Croft, 103 F.3d at 1126).

Here, AC-CYF's coercive investigations significantly disrupted Plaintiffs' family life without justification.  Both plaintiffs believed that they had no choice but to submit to these intrusive investigations and that their refusal could result in the loss of custody of their children. ECF # 17 at ¶¶ 4, 48,  55, 91. In both cases, AC-CYF interfered with Plaintiffs' critical first weeks with their new babies both physically, by requiring them to prepare and open their homes to governmental inspections, and emotionally, by distracting them with anxiety over the possible loss of their children. In both cases, AC-CYF had no basis to believe Plaintiffs' children were in danger and thus no justification for any intrusion into their private lives. AC-CYF's unjustified interference in the "private realm" of Plaintiffs' family life thus violated Plaintiffs' rights under the Fourteenth Amendment.

### C. UPMC's disclosure of Plaintiffs' private medical information to AC-CYF violated Plaintiffs' Fourteenth Amendment right to privacy in their medical records.

Plaintiffs have alleged that UPMC and Allegheny County coordinated and cooperated to violate their Fourteenth Amendment right to privacy by disclosing confidential medical information for the purpose of conducting baseless child abuse investigations. ECF # 1-2 at ¶¶ 130-136. Plaintiffs have a constitutionally protected right to privacy which includes "the right not to have [their] private affairs made public by the government."  United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir.

1980).  "In determining whether information is entitled to privacy protection, [the Third Circuit] ha[s] looked at whether it is within an individual's reasonable expectations of confidentiality. The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 179 (3d Cir. 2005) (quoting Fraternal Order of Police v. City of Philadelphia, 812 F.2d 105, 112 (3d Cir.1987)).

"There can be no question that medical records . . . are well within the ambit of materials that are entitled to privacy protection."  Id.; accord Gruenke v. Seip, 225 F.3d 290, 302 (3d Cir. 2000).  Indeed, "[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." Ferguson v. City of Charleston, 532 U.S. 67, 78 (2001).

While the right to privacy is not absolute, courts usually allow "intrusion into the zone of privacy . . . only after finding that the societal interest in disclosure outweighs the privacy interest on the specific facts of the case." Westinghouse, 638 F.2d at 578. The Third Circuit has identified seven factors which should be considered before allowing disclosure of an individual's private records.  These are:

> [1] the type of records requested, [2] the information it does or might contain, [3] the potential for harm in any subsequent nonconsensual disclosure, [4] the injury from disclosure to the relationship in which the record was generated, [5] the adequacy of safeguards to prevent unauthorized disclosure, [6] the degree of need for access and [7] whether there is an express statutory mandate, articulated public policy or other recognizable public interest militating toward access.

Id. The first five factors account for the individual's privacy expectation, while the last two factors account for the societal interest in disclosure. See C.N., 403 F.3d at 181.

UPMC argues that the disclosure of Plaintiffs' medical information to AC-CYF was justified because the intrusion into Plaintiffs' privacy was minor and was outweighed by society's need to know whether they had used marijuana while pregnant. ECF # 19 at 13. Considering the specific facts alleged in this case, it is clear that Plaintiffs' interest in keeping their medical information private vastly outweighed any societal interest in obtaining it.

      a. *Factors 1 and 2: "the type of records requested" and "the information it does or might contain"*

Factors one and two address the type of information that is being disclosed. UPMC argues that the scope of the disclosure of Plaintiffs' medical records was "minor." ECF # 19 at 13. In Ferguson, the United States Supreme Court recognized that the invasion of privacy involved in the collection and unauthorized disclosure of maternal drug test results was more severe than in any other case in which it had balanced the "intrusion on the individual's interest in privacy against the 'special needs' that supported the program." 532 U.S. at 78. This was because the Defendant hospital had collected the women's information without their informed consent, leading to a risk of "misunderstanding about the purpose of the test or the potential use of the test results." Id.

The information UPMC disclosed—confidential medical information regarding Plaintiffs' potential use of illicit substances while pregnant—is highly personal. Plaintiffs submit that reporting this information, without their knowledge or consent, to an arm of the government empowered to remove their children, is not a "minor disclosure."

>  b.  *Factors 3 and 5: "the potential for harm in any subsequent nonconsensual disclosure" and "the adequacy of safeguards to prevent unauthorized disclosure"*

Factors three and five question the potential for harm in a subsequent disclosure and the extent to which the confidentiality of the information is protected from such a disclosure.  These factors also weigh against UPMC's policy of providing its obstetrical patients' drug use information to AC-CYF.  It goes without saying that the potential harm to a new mother from disclosure to the community at large that she was accused of using drugs while pregnant would be severe.

Moreover, there clearly were not adequate safeguards in place to prevent unauthorized disclosure of Plaintiffs' confidential information to third parties. Plaintiffs allege that AC-CYF almost immediately disclosed Ms. Harrington's information to an outside contractor, to which it required her to disclose additional information.  ECF # 17 at ¶¶ 45-8, 52, 58-60. AC-CYF also interviewed Plaintiffs' pediatricians, dentists and school personnel, thus disclosing to members of Plaintiffs' community that, at a minimum, they were being investigated for child abuse and/or neglect. The allegations of the Complaint do not indicate that adequate safeguards were in place to prevent disclosure or "support[] the conclusion that those officials with private information would not disclose it." Fraternal Order of Police, Lodge No. 5, 812 F.2d at 118.

>  c.  *Factor 4: "the injury from disclosure to the relationship in which the record was generated"*

Factor four addresses the degree of harm that disclosure of marijuana use information will cause to the relationship between UPMC and its pregnant patients. UPMC gathers and/or solicits drug use information from its pregnant patients without their knowledge and/or under the auspices of routine medical treatment, and then discloses it

to a third party that has the capacity to cause them immeasurable harm, including taking their babies away from them.

These actions violated UPMC's ethical duties to its patients.  The American College of Obstetricians and Gynecologists ("ACOG") recommends that drug testing of pregnant women only be performed with the patient's consent and after she has been "informed of the potential ramifications of a positive test result, *including any mandatory reporting requirements*." ACOG Committee on Obstetric Practice No. 711 (August 2017) (emphasis added).  See also ACOG Committee on Ethics No. 633 (noting ethical responsibility to obtain informed consent when drug testing pregnant women.) The damage UPMC's unethical behavior causes to its relationships with maternity patients is immeasurable.

Moreover, by damaging its relationship with its pregnant patients, UPMC is causing a wider social harm.  Pregnant women whose trust has been betrayed in this manner (or their friends and acquaintances) may refrain from providing their physicians with accurate information, or they may refrain from seeking pre- and post-natal care for future pregnancies because UPMC has permanently damaged their trust in medical providers.[4] Thus, the disclosure of private drug use information not only damages the physician/patient relationship, but injures society at large, which has a vested interest in ensuring that pregnant women seek out and receive pre- and post-natal care.  See Sarah C.M. Roberts and Amani Nuru-Jeter, Women's perspectives on screening for alcohol and

---

[4] Treatment Improvement Protocol (TIP) Series, No. 24. Center for Substance Abuse Treatment. Rockville (MD): Substance Abuse and Mental Health Services Administration (US); 1997 https://www.ncbi.nlm.nih.gov/books/NBK64825/.  (noting likelihood that patients drug tested without their knowledge or consent will feel betrayed by their medical provider.)

<u>drug use in prenatal care</u>, 20 Women's Health Issues 193 (2010) (finding that women who used alcohol and drugs while pregnant concealed use and avoided prenatal care based on fear of disclosure to child protective services).

### d.  Factor 6: "the degree of need for access"

Regarding factor six, Plaintiffs maintain that there was no need for AC-CYF to know that Ms. Cook might have used marijuana before she knew she was pregnant or that Ms. Harrington tested positive for THC in an unconfirmed and unreliable test.  Nor does UPMC articulate any tangible public need for this information. Rather, it nonsensically contends that, "no child abuse investigation could ever be undertaken without the disclosure that Plaintiffs seek to enjoin." ECF # 19 at 13.

To be clear, Plaintiffs do not seek to enjoin UPMC from ever disclosing *any* information suggesting that a child is being abused.  UPMC can and should continue to report actual or suspected child abuse.  AC-CYF can and should continue to conduct child abuse investigations based on this information. Child abuse investigations can and should continue to take place. The only child abuse investigations that will not be undertaken are investigations based on suspected marijuana use by new mothers whose babies are born healthy and test negative for THC.  Plaintiffs contend that society's interest in these investigations, if any, does not outweigh a new mother's right to medical privacy.

### e.  Factor 7: "whether there is an express statutory mandate, articulated public policy or other recognizable public interest militating toward access"

Finally, with regard to factor seven, there is no "statutory mandate" or "articulated public policy militating toward access" to Plaintiffs' confidential marijuana use information.

In fact, as explained *supra,* the Commonwealth **has** articulated a public policy and statutory mandate concerning disclosure of maternal drug use information.  See 23 Pa. C.S.A. § 6386. That statute militates ***against*** access to the information UPMC disclosed. See *supra* at 5-7.

If the legislature had intended for § 6386 to mandate reporting of every positive maternal drug screen or every self-report of past illegal substance use by a new mother, it could easily have done so. Instead, the legislature focused on the effect of substance abuse on the child. In doing so it explicitly did not require disclosure where, as here, the baby has clearly not been affected by any illegal substance abuse.

### D.  UPMC and AC-CYF's practice of reporting and investigating potential marijuana use by new mothers, but not new fathers denied Plaintiffs their right to equal protection.

Plaintiffs claim that UPMC treated them differently than similarly situated men in violation of their Fourteenth Amendment right to equal protection.  See ECF # 17 at ¶¶141-52.  Specifically, Plaintiffs allege that UPMC has a policy of collecting information regarding new mothers' marijuana use and reporting that information to AC-CYF, but does not subject men who are likely to have custody of a newborn or very young child ("new fathers") to similar treatment.  Id. Plaintiffs similarly allege that AC-CYF has a policy of launching humiliating, invasive and burdensome child abuse investigations in response to reports that new mothers may have used marijuana, but does not conduct similar investigations when it receives reports that new fathers may have used marijuana. Id.

Plaintiffs submit that this disparate treatment is based on unfounded concerns that marijuana use will interfere with their ability to care for their newborns, coupled with outdated and improper assumptions about the roles of men and women in raising

children. It is well-settled that state action that places additional restrictions on women to which men are not subject in "rel[iance] on invalid gender stereotypes," "warrant[s] heightened scrutiny" by the courts.  Nevada Department of Human Resources v. Hibbs, 538 U.S. 721, 730 (2003).  Such suspect restrictions include those based on stereotypes about "women's roles … when they are mothers or mothers-to-be."  Id. at 736; see also id. at 729 (recounting with disapproval history of state actors treating women more restrictively based on view that "'proper discharge of [a woman's] maternal functions—having in view not merely her own health, but the well-being of the race—justif[ies]'" government intervention").

UPMC acknowledges that it treats new mothers and new fathers differently. It argues that it is justified in doing so because they are not "similarly situated."  ECF # 19 at 15-17.  UPMC proffers two differences between new mothers and new fathers which it claims justify treating them differently with regard to drug testing.  Both of these alleged justifications are premised on facts which are not of record, and which Plaintiffs dispute.

First, UPMC argues that it is justified in discriminating against new mothers because they are patients, while new fathers are not.  ECF # 19 at 16. According to UPMC, it needs to have "a complete medical picture of illegal-substances used that could bear on the health and safety of each patient." Id.  Plaintiffs dispute that UPMC needs to know whether a new mother used marijuana during her pregnancy in order to provide competent medical care to her and her baby.  Moreover, some new fathers *are* hospital patients (for reasons unrelated to giving birth). UPMC does not allege, let alone offer proof, that it routinely screens these men for marijuana use with a questionnaire and follow-up urine test. Plaintiffs allege that it does not. ECF # 17 at ¶¶142-3.

Second, UPMC argues it is justified in discriminating against new mothers because drug use while pregnant or breastfeeding can directly affect the health of their newborns. ECF # 19 at 16. Again, UPMC does not offer evidence that marijuana use during pregnancy or while breastfeeding poses a risk of harm to the baby, let alone a sufficient risk to justify drug testing pregnant women without their consent. Plaintiffs allege that there was no medical reason for UPMC to screen them for marijuana use. ECF # 17 at ¶¶ 14, 72-73. Plaintiffs are entitled to conduct discovery on this point.

Moreover, even if these differences between new mothers and fathers could support a discriminatory policy of collecting marijuana use information only from new mothers, they do not justify UPMC's discriminatory reporting policy. Once Plaintiffs' babies were born healthy and tested negative for controlled substances, there was no medical reason for UPMC to be concerned about their welfare. The only reason for UPMC to have alerted AC-CYF is if UPMC believed that marijuana use would interfere with their ability to care for a newborn. Plaintiffs have alleged that UPMC only reports marijuana use information collected from new mothers, raising an inference that UPMC does not share similar concerns about marijuana use interfering with new fathers' ability to care for newborns.[5] ECF # 17 at ¶145.

Similarly, the only reason for AC-CYF to investigate a report of marijuana use by the parent of a healthy baby is if AC-CYF believes that marijuana use will affect the parent's ability to care for the child. Plaintiffs allege that AC-CYF has a practice of

---

[5] If, as UPMC claims, it requires detailed substance abuse information to properly care for all of its patients, UPMC should drug test all of its patients, including new fathers. Plaintiffs have alleged that it does not. However, if it does, then every time a new father tests positive for marijuana, UPMC should report this information to AC-CYF. Plaintiffs allege that it does not.

investigating reports of marijuana use by new mothers, but not similarly investigating reports of marijuana use by new fathers or fathers of young children. ECF # 17 at ¶¶147-9.  AC-CYF has not responded to this allegation.[6]

Plaintiffs' allegations give rise to a reasonable inference that UPMC and AC-CYF subject new mothers to privacy violations and intrusive investigations that they do not inflict on men, based solely on sex-based assumptions about the roles of men and women in taking care of babies. This disparate treatment of similarly situated men and women violated Plaintiffs' rights under the Equal Protection Clause of the United States Constitution.

### E.  UPMC was a state actor and is subject to liability under 42 U.S.C. § 1983.

Plaintiffs' claims against UPMC are predicated on their assertions that UPMC, in coordination with AC-CYF, created and carried out a policy of surreptitiously performing urine drug screens for marijuana on pregnant patients and disclosing the results to AC-CYF solely to further AC-CYF's unconstitutional policies or practices.  This Court has explained that "allegations of joint participation in carrying out a state statute or scheme that is itself constitutionally defective state a claim for a due process deprivation." Mort v. Lawrence County Children & Youth Servs., No. 2:10-cv-1438, 2011 U.S. Dist. LEXIS 98338, *45 (Aug. 31, 2011) (citing Lugar v. Edmonson Oil Co., 457 U.S. 922, 942 (1982)).

Plaintiffs have alleged that UPMC had no medical reason to perform urine drug screens for marijuana on Plaintiffs and that doing so without their informed consent was

---

[6] AC-CYF appears to misunderstand Plaintiffs' equal protection claim, arguing that it was justified in not *drug testing* Plaintiffs' male partners because it had not received any report of drug use by these men.  This is not what Plaintiffs have alleged.

unethical.    UPMC's subsequent disclosure to AC-CYF of Plaintiffs' drug-test results creates a reasonable inference that the purpose of testing pregnant patients for marijuana was to identify new mothers who may have used marijuana while pregnant and to subject them to arbitrary and intrusive child abuse investigations.

>   *a. UPMC surreptitiously tested Plaintiffs' urine for marijuana to further its agreement with Allegheny County to identify pregnant women suspected of using marijuana to AC-CYS.*

UPMC's surreptitious testing of pregnant women's urine for marijuana is medically unnecessary and unethical.  Plaintiffs' allegation that UPMC had no medical reason to perform urine drug tests on Plaintiffs is supported by the ACOG, which does ***not*** recommend routine drug-testing of pregnant women. ACOG Committee on Ethics No. 633 (June 2015).  If a physician determines that urine drug-testing should be done in a particular woman's case, ACOG advises that it "should be performed only with the patient's consent and in compliance with state laws.  Pregnant women should be informed of the potential ramifications of a positive test result, *including any mandatory reporting requirements.*" ACOG Committee on Obstetric Practice No. 711 (August 2017) (emphasis added); see ACOG Committee on Ethics No. 633 ("When a legal or medical obligation exists for obstetrician–gynecologists to test patients for substance use disorder, there is an ethical responsibility to notify patients of this testing and make a reasonable effort to obtain informed consent.").    Likewise, the American Society of Addiction Medicine "recommends that, with the exception of emergency situations, pregnant women should provide explicit written consent for drug testing *including during labor and delivery.*  This informed consent should include an understanding of the possible consequences of test results." American Society of Addiction Medicine, Appropriate Use of Drug Testing in

23

Clinical     Addiction     Medicine,     https://www.asam.org/docs/default-source/quality-science/appropriate_use_of_drug_testing_in_clinical-1-(7).pdf?sfvrsn=2.

In this case, UPMC had an ethical obligation to inform Plaintiffs that unconfirmed positive results of urine drug screens for marijuana would be reported to AC-CYF and to obtain their consent before subjecting them to drug tests.   Plaintiffs intend to provide expert testimony supporting their allegation that UPMC had no medical reason to subject Plaintiffs to drug tests without their consent and that an unconfirmed positive for marijuana would not require any alterations in medical care for a mother or her baby.   The reasonable inference to be drawn from Plaintiffs' allegation that UPMC had a practice of surreptitiously drug testing pregnant patients is that it did so for a non-medical reason—to carry out its joint plan with AC-CYS to identify women suspected of using marijuana while pregnant and subject them to child-abuse investigations.

> b. *UPMC's actions were intended to further its agreement with Allegheny County to target new mothers suspected of prenatal marijuana use for child abuse investigations.*

This Court has held in two prior cases that similar allegations regarding a private hospital's actions in screening women for drugs without their knowledge or consent and reporting positive results to a children and youth services agency were sufficient to establish, at the motion-to-dismiss stage, that the hospital acted under color of state law by conspiring with the agency to deprive the parents of their Fourteenth Amendment rights.  See Bower v. Lawrence County Children & Youth Serv., No. 2:11-cv-931, 2011 WL 5523712, *21-22 (Nov. 14, 2011); Mort, 2011 U.S. Dist. LEXIS 98338, at *38.  In both cases, "the basic question" of whether the hospital was a state actor for purposes of 42 U.S.C. § 1983 was "whether the challenged act can be 'fairly attributed to the state.'"

Bower, 2011 WL 5523712 at *21 (citing Mort, 2011 U.S. Dist. LEXIS 98338 at *14). "The test is fact-intensive, and thus, difficult to resolve" at the motion-to-dismiss stage. Id. Among the allegations against Jameson Hospital that this Court held stated a claim for joint action were the hospital's integral role in testing and reporting and its knowledge that Lawrence County CYS would engage in unconstitutional actions in response to the hospital's reports of new mothers' positive urine drug tests. See Bower, 2011 WL 5523712 at *21-22. Plaintiffs have alleged that UPMC's policy or practice of surreptitious drug-testing and reporting of positive results to AC-CYF was integral to the violation of plaintiffs' Fourteenth Amendment rights and that UPMC knew its policy or practice would result in the violation of plaintiffs' constitutional rights. ECF # 17 at ¶ 103. Under both Mort and Bower, these allegations are sufficient to establish that UPMC engaged in joint action with AC-CYF sufficient to make it a state actor for purposes of § 1983.

UPMC's claim that it had no involvement in any subsequent actions by AC-CYF after it reported the drug-test results does not alter that conclusion. There were no allegations in *Mort* that Jameson Hospital had any involvement in Lawrence County CYS' unconstitutional actions following its report of pregnant patients' unconfirmed positive drug tests to the agency. Rather, this Court held that the allegation that the hospital knew that Lawrence County CYS would use the information it provided to engage in unconstitutional actions "create[d] a reasonably founded hope that the discovery process [would] reveal relevant evidence to support" a finding that the hospital was a joint participant in implementing the allegedly unconstitutional scheme. Mort, 2011 U.S. Dist. LEXIS 98338 at *48-50; see Bower, 2011 WL 5523712 at *21-22 ("In Mort, Judge Cercone concluded that a constitutional conspiracy claim had been properly pled because

Jameson allegedly worked closely with Lawrence County CYS to establish the testing program; played an integral role in testing and reporting; and knew that Lawrence County CYS would act to sever custody without undertaking any other investigation. That analysis is persuasive and equally applicable to the averments in this case.").

Although UPMC relies on this Court's summary judgment decision in *Bower* to support its argument that it is not a state actor, that decision was based on the Court's finding that "the evidentiary record does not reflect any joint participation between Jameson and LCCYS." Bower v. Lawrence Cty. Children & Youth Servs., 964 F. Supp. 2d 475, 488 (W.D. Pa. 2013). At the motion to dismiss stage, there is no evidentiary record; there are only the allegations in the Amended Complaint. Thus, the only issue for this Court to decide is whether the allegations of the Amended Complaint, taken as true, "create a reasonably founded hope that the discovery process will reveal relevant evidence to support" a finding that UPMC was a joint participant in implementing the allegedly unconstitutional scheme. Mort, 2011 U.S. Dist. LEXIS 98338 at *50. This Court held in Mort and Bower that allegations similar to those in this case regarding joint action between a hospital and a CYS agency were sufficient to establish that the hospital was a state actor. The fact that the Bower plaintiff was ultimately unable to produce evidence in support of those allegations does not mean that Plaintiffs will be unable do so, especially when the allegations are against an entirely different hospital and county agency.

Finally, the cases UPMC cites in support of its claim that private health care providers who report potential child abuse or other crimes to local children's services agencies are not acting under color of law are not relevant for two reasons. First, unlike

the cases cited by UPMC, plaintiffs in this case allege that UPMC had no statutory duty under state law to report plaintiffs' confidential medical information to AC-CYF.  See *supra* at 5-7.

Second, unlike the health care providers in the cases cited by UPMC, UPMC took affirmative steps, in violation of medical ethics, to obtain the very information it claims it was statutorily obligated to report.  In <u>Ferguson</u>, the U.S. Supreme Court distinguished between the duty of hospital employees "to provide the police with evidence of criminal conduct that they inadvertently acquire in the course of routine treatment" and evidence they obtain from their patients "for the specific purpose of incriminating those patients," 532 U.S. at 84-85 (explaining that when hospital employees undertake to obtain evidence from their patients for the purpose of incriminating them, "they have a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require").  UPMC's practice of surreptitiously performing urine drug screens for marijuana on pregnant patients for the purpose of providing those results to AC-CYS distinguishes it from hospitals or other medical providers that merely report evidence of child abuse that is inadvertently acquired in the course of routine treatment.[7]  The latter are not state actors because unlike UPMC, they have not coordinated with child welfare agencies to undertake actions that are not medically necessary and are performed only to provide information to a government agency.

---

[7] See <u>Mueller v. Auker</u>, 700 F.3d 1180, 1191-92 (9th Cir. 2012) (hospital made report to child protective services after mother refused to consent to emergency medical treatment for her child); <u>Brown v. Newberger</u>, 291 F.3d 89, 93-94 (1st Cir. 2002) (private social worker made report of suspected sexual abuse by father based on concerns developed during meeting with mother and child); <u>Thomas v. Beth Israel Hosp., Inc.</u>, 710 F. Supp. 935, 940-41 (S.D.N.Y. 1989) (hospital filed report of suspected child abuse after observing multiple abrasions and bruises on legs of child who had been brought to hospital by police); <u>Haag v. Cuyahoga County</u>, 619 F. Supp. 262, 283 (N.D. Ohio 1985) (psychologist made child abuse report against father after meeting with child and mother).

Accordingly, it is not the act of reporting the allegations about Plaintiffs' prenatal marijuana use to AC-CYF that makes UPMC a state actor. Rather, it is UPMC's decision to perform urine drug screens for marijuana on pregnant women without their informed consent for the sole purpose of providing that information to AC-CYF that allows its "seemingly private behavior [to] be fairly treated as that of the State itself." Brentwood Acad., 531 U.S. at 296 (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974)).

Viewed as a whole and taken as true, the allegations that UPMC had a policy or practice of surreptitiously drug testing pregnant patients for the sole purpose of identifying and investigating new mothers who may have used marijuana while pregnant demonstrates that Plaintiffs have pleaded "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007); see Abbott v. Latshaw, 164 F.3d 141, 147-48 (3d Cir. 1998) ("a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of § 1983").

### F. Plaintiffs' allegations state a claim against Allegheny County for adopting policies and procedures that violate Plaintiffs' Fourteenth Amendment rights.

"To plead a municipal liability claim, a plaintiff must allege that 'a [local] government's policy or custom . . . inflict[ed] the injury' in question." Estate of Roman v. City of Newark, 914 F.3d 789, 798-99 (3d Cir. 2019) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). In this case, plaintiffs have alleged the proximate cause of the violations of their constitutional rights was AC-CYF's custom, pattern, practice, or policy of investigating new mothers based solely on reports by UPMC of

suspected prenatal marijuana use, and/or AC-CYF's failure to appropriately train and/or discipline its caseworkers who engaged in such investigations.[8]  See Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff must prove "that the municipal practice was the proximate cause of the injuries suffered").  Specifically, plaintiffs have alleged that:

- AC-CYF, by virtue of a custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, acquiesced in and/or has otherwise authorized its caseworkers to violate citizens' constitutional rights by initiating unwarranted, highly intrusive, humiliating and coercive child abuse investigations into new mothers and their families. ECF # 17 at ¶ 124;

- AC-CYF encouraged UPMC to continue violating Plaintiffs' rights be accepting records which it knew UPMC was not privileged or legally required to disclose and, based exclusively on these records, initiating unwarranted highly intrusive, humiliating and coercive child abuse investigations. Id.  ¶ 131;

- AC-CYF, by virtue of custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, authorizes its caseworkers to act in an unconstitutional fashion by threatening women with adverse consequences unless the participate in a drug counseling program, in violation of their right to be free from compelled speech, based solely on a hospital report that they had an unconfirmed positive test for marijuana while pregnant and despite the lack of any evidence that the women have abused or neglected their children. Id. ¶ 138;

- AC-CYF had a policy and practice of accepting on and acting on confidential information it received from UPMC, knowing that the information was being collected only from new mothers and was not being collected from similarly situated men. Id. ¶ 147;

---

[8] There is no requirement that plaintiffs identify a specific policy and attribute it to a policy-making official within AC-CYF to allege municipal liability at the pleading stage.  See Carter v. City of Philadelphia, 181 F.3d 339, 357–58 (3d Cir. 1999) (reversing district court's dismissal of plaintiff's municipal liability claim because the court's "insistence that [plaintiff] must identify a particular policy and attribute it to a policymaker, at the pleading stage without benefit of discovery, is unduly harsh").  Rather, plaintiffs "must adequately give notice to a municipality-defendant for the basis of [their] claim, which requires some specificity as to the custom, policy, or procedure which caused the plaintiff's injuries as opposed to a generic and unspecified reference to a custom, policy, or procedure."  See Moore v. Ryan, No. 1:12–CV–1875, 2013 WL 1339053, *7 (M.D. Pa. April 1, 2013) (citing Carter, 181 F.3d at 357–58).

- AC-CYF, by virtue of custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, authorizes its caseworkers to act in an unconstitutional fashion by requiring women to submit to a urine drug test without statutory authorization based solely on a hospital report that they had an unconfirmed positive test for marijuana while pregnant and without any basis to believe that the women have abused or neglected their children. Id. ¶ 154;

- AC-CYF, by virtue of a custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, authorized its caseworkers to act in an unconstitutional fashion by requiring women to submit to a urine drug test without statutory authorization based solely on a hospital report that they had an unconfirmed positive test for marijuana and without any basis to believe that the women have abused or neglected their children. Id. ¶ 158.

In support of these policy and practice allegations, plaintiffs have pleaded specific facts evincing that the decisions to investigate Plaintiffs were not done at the whim of individual caseworkers but were instead carried out at the direction of AC-CYF policymakers:

- AC-CYF caseworker Grant Walker informed Ms. Harrington when he showed up at her hospital room that "whenever UPMC reported a new mother's positive drug test to AC-CYF, AC-CYF opened an investigation" and that "upon her discharge from the hospital, AC-CYF would subject her private residence to a 'home inspection.' Id. ¶¶ 36-37;

- Walker told Ms. Harrington that because of the UPMC report, AC-CYF would require her to participate in a drug counseling session with a representative of [POWER] and submit to another drug test administered by the organization at her home" and that AC-CYF would follow POWER's recommendation. Id. ¶¶ 45, 52; and

- Based on the report from the UPMC employee, AC-CYF initiated a child abuse investigation into Ms. Cook and S.J.'s father. Id. ¶ 88.[9]

---

[9] If the Court determines that Plaintiffs have not pleaded sufficient facts to find that AC-CYF has a policy, practice, or custom of investigating new mothers based on UPMC reports alleging they used marijuana while pregnant, then plaintiffs request leave to amend their complaint to add additional allegations.  After filing this lawsuit, Plaintiffs' lawyers have been contacted by numerous women who were subjected to similar investigations by AC-CYF following UPMC reports of alleged prenatal marijuana use.

Moreover, AC-CYF itself justifies the investigations targeting plaintiffs as being undertaken pursuant to AC-CYF's "duty under Pennsylvania Child Protective Services Law, 23 Pa.C.S. §§ 6301-6385, and Pennsylvania Department of Human Services regulations." ECF # 21 at 9.  Allegheny County never argues that plaintiffs have failed to allege a policy of investigating every report by UPMC of a baby born to a mother suspected of using marijuana while pregnant.  Instead, Allegheny County claims that it cannot be municipally liable for the constitutional violations plaintiffs suffered if its employees are not liable in their individual capacities.  But that argument puts the proverbial cart before the horse.  There has been no judicial absolution of the individual caseworkers for their roles in the violation of Plaintiffs' rights.  That Plaintiffs chose not to name the individual caseworkers as defendants has no bearing on whether the policy, custom, or pattern they followed was itself unconstitutional.[10]

Precedent in the Third Circuit "'requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual . . . officers.'" Barna v. Board of School Directors of the Panther Valley School District, 877 F.3d 136, 145, n.6 (3d Cir. 2017) (quoting Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996)).  It is only when the evidence demonstrates that there has been no violation of the plaintiff's constitutional rights at all that municipal liability is impossible.  See City of L.A. v. Heller, 475 U.S. 796, 799 (1986) (plaintiff could not proceed on municipal liability claim against city after jury returned verdict for officer alleged to have violated plaintiff's Fourth Amendment rights).  When the evidence shows that a plaintiff has suffered a

---

[10] Because this is a class action lawsuit seeking both damages and injunctive relief, Plaintiffs chose to name only Allegheny County, and not the individual caseworkers, as a defendant.

constitutional injury but a municipal employee is not liable due to Section 1983's strict mental state requirements, the municipality nevertheless may be held liable if its "municipal policy or custom could be found to have 'caused' the alleged constitutional deprivation."  Estate of Thomas v. Fayette County, 194 F. Supp. 3d 358 (W.D. Pa. 2016).[11]

"'To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue.'"  Id. (quoting Bielevicz, 915 F.2d at 850).  "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."  Bielevicz, 915 F.2d at 851.  Plaintiffs have alleged that AC-CYF's policy, practice, or custom of subjecting new mothers to child abuse investigations based solely on allegations by UPMC of prenatal marijuana use caused the violation of their constitutional rights.  Unlike a situation in which a caseworker is called to a home based on an allegation of child abuse and must decide what course of action to take, the procedures followed by the caseworkers in plaintiffs' cases were foreordained.  Accordingly, it was Allegheny County's policy, practice, or custom of subjecting new mothers to child abuse investigations whenever UPMC reported that the mothers had used marijuana while pregnant that caused the violation of Plaintiffs' Fourteenth Amendment rights.

---

[11] Municipalities can also be liable for the violation of constitutional rights when the employees who carried out the constitutional violations are entitled to qualified immunity.  See, e.g., Davila v. N. Reg'l Joint Police Bd., 370 F. Supp. 3d 498, 546 (W.D. Pa. 2019) (holding police department liable for violation of plaintiff's Fourth Amendment rights even though police officer who arrested her was entitled to qualified immunity on false arrest claim because officer was acting pursuant to policy that caused the violation of plaintiff's rights).

### G. Plaintiffs' allegations state a claim against Allegheny County for adopting policies and procedures that violated Ms. Harrington's First and Fourth Amendment Rights.

Allegheny County fails to state any independent basis for dismissing Ms. Harrington's First and Fourth Amendment claims and instead relies on its argument that the investigation, and all of the events that flowed from it, were justified by its interest in protecting children. According to the County, "there is nothing about asking to inspect the homes where children live or asking for authorizations to view medical [*sic*] other records or asking a parent to submit to a drug test as part of the investigation that establishes a policy or custom by the County that is deliberately indifferent to the Plaintiffs' constitutional rights." ECF #21 at 19.

As an initial matter, the First and Fourth Amendment claims brought by Ms. Harrington are based on Allegheny County's policy, practice, or custom of requiring new mothers who allegedly test positive for marijuana while pregnant to participate in drug-abuse counseling and submit to urine drug testing and thus do not require a showing of deliberate indifference. See Bd. of the Cty. Comm'rs v. Brown, 520 U.S. 397, 404-05 (1997).

Moreover, Ms. Harrington's First and Fourth Amendment claims are based on her allegations that AC-CYF lacked any legitimate basis upon which to compel her to participate in the drug-abuse counseling or drug testing. AC-CYF had no interest justifying its requirement that Ms. Harrington answer questions about her personal life. Nor did it have any interest or statutory authority to require her to submit to drug-testing.[12]

---

[12] See In the Interest of D.R., Nos. 45 WAP 2019, 46 WAP 2019, 47 WAP 2019, 48 WAP 2019, 49 WAP 2019, 2020 Pa. LEXIS 3254, at *27 (June 16, 2020) (child welfare agency's "authority to investigate does not include the authority to obtain an involuntary urine sample from the subject of the investigation").

Demanding that Ms. Harrington comply with those requirements violated her First Amendment right to be free from compelled speech[13] and her right under the Fourth Amendment to the U.S. Constitution and Art. 1, § 8 of the Pennsylvania Constitution to be free from unreasonable searches.[14]

### H. UPMC violated Plaintiffs' right to physician/patient confidentiality by reporting their confidential medical information to AC-CYF without any legal justification.

UPMC does not dispute that it communicated Plaintiffs' confidential medical information to AC-CYF and that, if it did so without "legal justification or excuse," it is liable to Plaintiffs for the damages this disclosure caused. ECF # 19 at 17-18. UPMC argues, however, that it was legally justified in in disclosing Plaintiffs' information because it was required to do so under the CPSL. UPMC further argues that because it was required to report this information it is immune from liability. Id. at 19-19.

UPMC is incorrect on both counts because, as discussed supra, the CPSL did not require UPMC to report Plaintiffs' confidential marijuana use information to AC-CYF. Thus, UPMC had no legal justification or excuse for its actions. While the CPSL bestows immunity on those who, "acting in good faith," report suspected child abuse or make a referral for general protective services, only those who are required to make a report

---

[13] See C. N., 430 F.3d at 188 ("the law does not hold that a compelled speech violation occurs only in the context of compulsion to embrace a certain viewpoint; rather, it subjects compelled speech to different levels of scrutiny depending on whether the government is also compelling a certain viewpoint as part of the compelled speech").

[14] See In the Interest of D.R., 2020 Pa. LEXIS 3254 at *14 ("The Courts have been clear that the taking of bodily fluids is a search. Thus, even if authorized, any search must be predicated by a showing of probable cause."). Ms. Harrington does not seek monetary damages for the violation of her rights under the Pennsylvania Constitution but does seek a declaration from this Court that Allegheny County violated her rights under Art. 1, § 8 and an injunction prohibiting Allegheny County from compelling parents to submit to urine drug tests pursuant to child-abuse investigations.

pursuant to 23 Pa. C.S. § 6311 receive a presumption of good faith. Id. at § 6318. UPMC
is not entitled to a presumption of good faith because it was not required to make a report.

Moreover, even if UPMC were entitled to a presumption of good faith, this
presumption can be rebutted on a motion to dismiss with allegations of bad faith. Weaver
v. Marling, No. 2:12-CV-1777, 2013 WL 4040472, at *8 (W.D. Pa. Aug. 8, 2013)
(presumption of good faith overcome on motion to dismiss by allegations of bad faith);
Miller v. City of Philadelphia, 954 F. Supp. 1056, 1066 (E.D. Pa. 1997), aff'd, 174 F.3d
368 (3d Cir. 1999) (defendant social worker not entitled to good faith immunity under §
6318 where plaintiffs stated sufficient allegations of bad faith); see also Yelland v.
Abington Heights Sch. Dist., No. CV 3:16-2080, 2018 WL 3217643, at *13 (M.D. Pa. July
2, 2018) (denying summary judgment where plaintiff presented evidence of bad faith.).
Even in Bower, which UPMC relies upon for the proposition that it is entitled to good faith
immunity as a matter of law, this Court denied the defendant's motion to dismiss and
permitted the plaintiff to develop the record. Bower, 2011 WL 5523712, at *8–9.

Plaintiffs have alleged facts sufficient to raise a reasonable inference that UPMC
acted unreasonably and in bad faith when it disclosed Plaintiffs' medical information to
AC-CYF. Good faith under the CPSL is to be measured by an objective standard; the
reporter's subjective motivations are irrelevant. See Miller, 954 F. Supp. at 1066. Thus,
Plaintiffs need not alleged actual malice by UPMC; they need only allege that its conduct
was objectively unreasonable. See Bower, 964 F. Supp. 2d at 489 (good faith presumed
where hospital had "reasonable cause" to report). Plaintiffs have alleged that UPMC
unnecessarily performed urine drug screens for marijuana on them without their informed
consent for the express purpose of conveying the results of those drug screens to AC-

CYF. ECF # 17 at ¶¶ 13,16, 72, 75; see also supra at 23-24. Plaintiffs further allege that UPMC was aware that the information was unreliable, that it had no reason to suspect that Plaintiffs' children were being abused, and that UPMC knew the reports would subject Plaintiffs' to baseless child abuse investigations. See, e.g., ECF 17 at ¶¶ 22, 29, 32, 100-7. These allegations are sufficient to overcome any presumption of good faith that UPMC might otherwise be entitled to.

Finally, UPMC's claim that it could have been subject to criminal penalties if it failed to report Plaintiffs' drug use information to AC-CYF is without merit.  23 Pa. C.S. § 6319 provides for penalties for the failure to make required reports.  As stated above, UPMC was not required to report Plaintiffs' drug use information.  UPMC may have chosen to adopt an overbroad, unreasonable, and patently incorrect interpretation of its responsibilities under the CPSL in order to avoid the possibility of criminal penalties. However, in doing so it sacrificed its legal obligation to protect its patients' private medical information from disclosure.  UPMC's decision to take unreasonable steps to protect itself is not a "legal justification or excuse" for breaching its duty of confidentiality to Plaintiffs.

## IV)   CONCLUSION

For all of the foregoing reasons, Defendants' Motions to Dismiss should be Denied.

Respectfully submitted,

THE LAW OFFICES OF TIMOTHY P. O'BRIEN

/s/ Margaret S. Coleman
Margaret S. Coleman
Pa. ID No. 200975

535 Smithfield Street, Suite 1025
Pittsburgh, PA  15222
(412) 232-4400

and

ACLU OF PENNSYLVANIA

/s/ Sara J. Rose
Sara J. Rose
Pa. ID No. 204936
Witold J. Walczak
Pa. ID No. 62976

P.O. Box 23058
Pittsburgh, PA 15222
(412) 681-7864