**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHERELL HARRINGTON and       )
DESERAE COOK, *individually*   )
*and on behalf of all persons similarly*   )
*situated,*   )
                               )
                  Plaintiffs,  )
                               )
          v.                   )          Civil Action No. 20-497
                               )
UPMC and ALLEGHENY COUNTY,     )
                               )
                  Defendants.  )

**<u>MEMORANDUM OPINION</u>**

Presently before the Court are the Motions to Dismiss Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and briefs in support thereof, filed by UPMC (Docket Nos. 18, 19) and by Allegheny County (Docket Nos. 20, 21), Plaintiffs' Omnibus Brief in Opposition to Defendants' Motions to Dismiss the First Amended Complaint (Docket No. 28), and the replies filed by UPMC and Allegheny County (Docket Nos. 37, 38). For the reasons set forth herein, UPMC's motion is denied, and Allegheny County's motion is granted in part and denied in part.

## I.    <u>Procedural and Factual Background</u>

Plaintiffs Cherell Harrington and Deserae Cook filed a Complaint in Civil Action in the Court of Common Pleas of Allegheny County, Pennsylvania, on behalf of themselves and two putative classes, alleging various claims against the University of Pittsburgh Medical Center ("UPMC") and Allegheny County via its Office of Children, Youth and Families ("AC-CYF") arising out of UPMC's purported disclosure of their confidential medical information to AC-CYF for the purpose of targeting them with highly intrusive, humiliating and coercive child abuse

investigations starting before taking their newborn babies home from UPMC's hospitals shortly after childbirth. (Docket No. 1-2). Defendants removed the case to this Court (Docket No. 1), and Plaintiffs subsequently filed an Amended Class Action Complaint (Docket No. 17) ("Amended Complaint") alleging several claims against UPMC and AC-CYF pursuant to 42 U.S.C. § 1983 for violations of the 1st, 4th, and 14th Amendments to the United States Constitution, a claim against AC-CYF for violations of the Pennsylvania Constitution, and Pennsylvania common law claims against UPMC for breaches of physician-patient confidentiality.

At this stage of the case, the factual allegations set forth in the Amended Complaint must be taken as true and viewed in the light most favorable to Plaintiffs. These allegations are recounted as follows.

### A.      Plaintiff Cherell Harrington

Harrington is the mother of three children and until the birth of her third child had never been accused of abusing or mistreating her children in any way. (Docket No. 17, ¶ 10). She was admitted to UPMC's Magee Women's Hospital ("Magee") on November 29, 2017, and gave birth to her third child, a son, who was born healthy *via* caesarean section the same day. (*Id.* ¶¶ 11, 23).

Upon her admission to the hospital, Magee employees collected Harrington's urine and tested it for drugs without her knowledge, consent, or any medical reason. (Docket No. 17, ¶¶ 13-15). The urine sample taken from Harrington came back "unconfirmed positive" for marijuana, further stating, in part, that "[t]he results are to be used only for medical purposes. Unconfirmed screening results must not be used for non-medical purposes (e.g., employment testing, legal testing)," and "the tests . . . are not definitive. Until definitive testing confirms any result, the result should be regarded as provisional and uncertain." (*Id.* ¶¶ 19-21). Magee personnel likewise

administered a drug test to Harrington's newborn son without Harrington's knowledge or consent. (*Id.* ¶ 24).  The newborn's test results were negative for all illicit drugs.  (*Id.* ¶ 25).

The next day, as Harrington was recovering from surgery and caring for her newborn son, a UPMC social worker entered her room and informed her that she had tested positive for marijuana and that her son had tested negative, but that her positive test result would be reported to AC-CYF.  (Docket No. 17, ¶ 26).  Harrington told the social worker there was no reason to report the result because it was false and her newborn's test result was negative, yet the social worker told her she was required to report the result to AC-CYF.  (*Id.* ¶ 27).  The social worker had no reason to suspect or believe Harrington's newborn had been affected by illegal substance abuse or was having withdrawal symptoms resulting from prenatal drug exposure.  (*Id.* ¶ 30).  That same day, without Harrington's consent, and without medical necessity, reason, or justification, UPMC reported her confidential unconfirmed positive drug test result to AC-CYF while also reporting that her newborn had tested negative and was "in good health."  (*Id.* ¶¶ 31-32).  Then, later that evening, a nurse attending to Harrington told her that because she tested positive, she should not breastfeed her son and that UPMC would not support or assist her in doing so.  (*Id.* ¶ 33).

On December 1, 2017, less than three days after giving birth to her son, an AC-CYF case worker entered Harrington's private hospital room to inform her that AC-CYF was investigating her for child abuse based upon a report received from UPMC.  (Docket No. 17, ¶ 33).  Despite Harrington's objection to the investigation because her positive test result was "unconfirmed," the case worker told her that AC-CYF opens an investigation whenever it receives a report from UPMC that a new mother tested positive for drugs.  (*Id.* ¶ 36).  Then, while still in Harrington's private hospital room, the AC-CYF case worker photographed Harrington's healthy newborn baby

and required Harrington to sign various AC-CYF forms and documents; the case worker also told her that AC-CYF would be subjecting her private residence to a home inspection upon discharge from the hospital.  (*Id.* ¶ 37).

On December 4, 2017, merely two days after Harrington was discharged from the hospital, the same AC-CYF case worker arrived at her home, toured her house, inspected her refrigerator and cupboards, and took photographs of her children.  (Docket No. 17, ¶¶ 41-43).  The case worker required Harrington and her husband to answer detailed personal questions about their education, employment, family and medical histories, and he asked their then-eleven-year-old daughter about Harrington's "use of addictive substances."  (*Id.* ¶ 44).

The case worker also told Harrington that because of UPMC's report to AC-CYF, AC-CYF would be requiring her to participate in a drug counseling session with a representative of Pennsylvania Organization for Women in Early Recovery ("POWER") and submit to another drug test administered by it.  (Docket No. 17, ¶ 45).  When Harrington objected to participating in this process, the case worker told her that if she did not complete POWER's assessment, he would report her "failure to cooperate" to a judge and require her to travel to downtown Pittsburgh for monthly drug tests.  (*Id.* ¶¶ 46-47).  Fearful of losing custody of her children, Harrington submitted to the POWER assessment under duress.  (*Id.* ¶ 48).  The case worker noted on an AC-CYF form that Harrington "cannot or will not control [her] behavior" and that her "protective capacity" for her children was "diminished" due, exclusively, to the unconfirmed positive drug test result reported by UPMC.  (*Id.* ¶ 56).

During this home inspection, the case worker also required Harrington to sign numerous papers, including releases permitting AC-CYF to contact and obtain confidential information from her 11-year-old daughter's pediatrician, dentist, and school.  The case worker would not give

Harrington copies of these documents.  Again, fearful of losing custody of her children, Harrington signed these documents.  (Docket No. 17, ¶¶ 53-55).

On December 27, 2017, a POWER representative arrived at Harrington's home two hours earlier than scheduled.  Upon arrival, the representative asked Harrington a series of questions about her personal life, including whether she had a history of illegal drug use.  (Docket No. 17, ¶¶ 58-59).  The representative also administered another urine drug test with a negative result. Harrington believes this POWER representative submitted a report to AC-CYF which included Harrington's answers to the representative's questions.  (*Id.* ¶¶ 60-61).  Then, on December 29, 2017, a representative from POWER informed the AC-CYF case worker that Harrington was "not recommended for treatment."  (*Id.* ¶ 62).

Notwithstanding POWER's recommendation, in early January 2018, the AC-CYF case worker persisted with his investigation by contacting Harrington's daughter's school and interviewing the school's social worker, by contacting Harrington's pediatrician and obtaining medical information about all three of her children, and by contacting Harrington's dentist and obtaining her daughter's dental information.  (Docket No. 17, ¶¶ 63-65).  Then, on January 8, 2018, the case worker returned to tour Harrington's home a second time and inspected her bedrooms and the contents of her refrigerator and kitchen cabinets.  The case worker also interviewed Harrington's daughter.  (*Id.* ¶ 66).  Before leaving Harrington's home, the case worker informed Harrington that he would speak with his supervisor regarding the status of the investigation. Harrington received no further communications from the case worker or anyone else at AC-CYF. (*Id.* ¶¶ 66-67).

B.    **Plaintiff Deserae Cook**

Cook is the mother of two children, a 5-year-old boy and a 1-year-old girl.  (Docket No. 17, ¶ 68).  She was admitted to UPMC's Mercy Hospital ("Mercy") on July 7, 2018 and gave birth to her healthy daughter that same day.  (*Id.* ¶¶ 69, 80).  As part of the hospital admission intake process, a Mercy employee asked Cook whether she had ever used illegal drugs, to which Cook responded that she had smoked marijuana in the past but "quit everything" when she found out she was pregnant.  (*Id.* ¶ 71).  Thereafter, Mercy employees collected Cook's urine and tested it for drugs without her knowledge, consent, or medical reason.  (*Id.* ¶¶ 72-75).  Mercy personnel likewise administered a drug test to Cook's newborn daughter without Cook's knowledge or consent.  (*Id.* ¶ 82).  Both Cook's and her newborn daughter's drug test results were negative.  (*Id.* ¶¶ 79, 82).

The next day, a UPMC employee entered Cook's hospital room and informed Cook and the newborn's father that although she tested negative for drugs, UPMC was "required" to report her to AC-CYF because of her answers to the intake questions.  (Docket No. 17, ¶ 84).  Before that date, UPMC never informed Cook that her answers to the patient intake questions would be used as the basis to report confidential information to AC-CYF.  (*Id.* ¶ 84).  Then, the following day, July 9, 2018, without Cook's consent, a Mercy employee contacted AC-CYF and reported, in part, that Cook's and her newborn daughter's drug test results were negative, but that Cook "admitted to using marijuana in the beginning of her pregnancy but stopped when she found out she was pregnant.  No current concerns[.]"  (*Id.* ¶ 85).  Cook was discharged from the hospital that same day.  (*Id.* ¶ 89).

After being discharged, an AC-CYF caseworker left a note on Cook's door stating that she needed to contact the caseworker to schedule a home inspection.  (Docket No. 17, ¶ 90).  Fearing

the loss of custody of her children, Cook contacted the caseworker and scheduled a home inspection as instructed. (*Id.* ¶ 91). Then, on July 24, 2018, an AC-CYF case worker arrived at Cook's home and completed a "walk through", during which she inspected her children's bedrooms, the amount of food in the kitchen and the amount of children's clothing and toys. (*Id.* ¶ 92). The caseworker also interrogated Cook and the children's father about their education, employment, family and medical histories, and provided unsolicited parenting advice and provided them with a "parent handbook." (*Id.*). The AC-CYF case worker also required Cook to sign a release for both of her children's medical records. (*Id.*).

The next day, on July 25, 2018, the AC-CYF case worker completed a "Pennsylvania Model Risk Assessment Form" in which she concluded that there was "no risk" to Cook's children. (Docket No. 17, ¶ 93). Despite this "finding," Cook received numerous phone calls from social service agencies offering unnecessary services for her and her children. (*Id.* ¶ 94). Then, on August 23, 2018, the AC-CYF case worker signed a letter informing Cook that her family was not accepted for services by AC-CYF, and that neither further intervention nor ongoing services were needed. (*Id.* ¶ 95). The next day, and despite having concluded that no further intervention or services were needed, the AC-CYF case worker returned to Cook's home and conducted another home inspection and interrogated Cook about her children's medical histories, medical insurance, and recent doctor's visits. (*Id.* ¶ 96). Then, a few days later, on August 27, 2018, the AC-CYF case worker sought and obtained confidential medical information regarding both of her children from their pediatrician despite having previously concluded that no further intervention or services were needed. (*Id.* ¶ 97).

**C.**    **Other UPMC Patients Allegedly Experienced Similar Intrusions Due to UPMC's Practices, Policies, and/or Agreements with AC-CYF.**

Plaintiffs also allege that, in accordance with past practices, policies, and/or agreements with AC-CYF, UPMC unjustifiably and in bad faith disclosed to AC-CYF both their and other patients' confidential medical information concerning self-reported prior drug use or "unconfirmed" positive results of surreptitiously conducted drug tests, knowing that AC-CYF routinely accepted and acted on UPMC's disclosures to conduct unwarranted and highly intrusive, humiliating, coercive, and unconstitutional child abuse investigations, in some instances commencing while the patients were still in their private hospital rooms shortly after childbirth. (Docket No. 17, ¶¶ 5, 35, 100-103, 124).

In one other such instance, another UPMC patient, Rachel Devore, filed a civil complaint against UPMC in the Court of Common Pleas of Allegheny County alleging, like Plaintiffs here, that UPMC violated her right to physician-patient confidentiality when it drug tested her urine without her consent and reported the "unconfirmed positive" result to AC-CYF, who then subjected her to a child abuse investigation. (Docket No. 17, ¶ 99). Plaintiffs allege that Devore's litigation resolved after the Court of Common Pleas denied UPMC's preliminary objections. (*Id.*).

Plaintiffs seek to represent two classes.[1]  The first class, called the "UPMC Class," putatively consists of the following:

> All women who on or after March 11, 2018, were subjected to urine drug tests while admitted to a UPMC facility for the purpose of giving birth, whose newborns tested negative for controlled substances and whose urine drug test results or other medical information related to substance use was disclosed to AC-CYF.

---

[1]     Plaintiffs errantly seek class action pursuant to Pennsylvania Rules of Civil Procedure No. 1701 *et seq.* Rather, Rule 23 of the Federal Rules of Civil Procedure is applicable here.

(Docket No. 17, ¶¶ 108, 109(a)). The second class, called the "AC-CYF Class," putatively consists of the following:

> All new mothers who, on or after March 11, 2018, were subjected to investigation by AC-CYF based solely on reports of past marijuana use or a urine drug test that tested positive for marijuana.

(*Id.*). Plaintiffs assert the following claims on behalf of themselves and these putative classes:

At Count One, Plaintiffs assert claims against UPMC alleging it breached its duty of patient confidentiality recognized by Pennsylvania common law and falsely portrayed Plaintiffs as abusers of illegal drugs.

At Count Two, Plaintiffs assert claims against UPMC and AC-CYF pursuant to 42 U.S.C. § 1983 ("Section 1983") for violations of their rights under the Fourteenth Amendment to the United States Constitution to be free from government intrusion "into family privacy including upon the birth of a child."

At Count Three, Plaintiffs assert claims against UPMC and AC-CYF pursuant to Section 1983 for violations of their rights to privacy in personal and confidential medical records under the Fourteenth Amendment to the United States Constitution.

At Count Four, Harrington asserts a claim against AC-CYF pursuant to Section 1983 for threatening to report her to a judge and require her to submit to monthly drug tests unless she participated in the POWER program, which required her to answer questions about her personal life and thus violated her right to be free from compelled speech, in violation of the First Amendment to the United States Constitution.

At Count Five, Plaintiffs assert claims against UPMC and AC-CYF pursuant to Section 1983 alleging that they subjected new mothers, but not similarly situated men, to unwarranted highly invasive, burdensome, humiliating, and unconstitutional child abuse or child neglect

investigations, in violation of the Equal Protection Cause of the Fourteenth Amendment to the United States Constitution.

At Count Six, Harrington asserts a claim against AC-CYF pursuant to Section 1983 alleging that it violated the Fourth Amendment by requiring her to submit to drug tests based solely on a hospital report of an unconfirmed positive test for marijuana while pregnant and without any basis to believe that she abused or neglected her children.

At Count Seven, Harrington asserts a claim against AC-CYF alleging that it required Harrington to submit to a urine drug test in violation of her right to privacy under Art. I, Sec. 8, of the Pennsylvania Constitution.

Plaintiffs seek declaratory and injunctive relief, compensatory damages, attorneys' fees, and costs against both UPMC and AC-CYF.  Plaintiffs also seek punitive damages against UPMC.

Both UPMC and AC-CYF filed Motions to Dismiss Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  UPMC contends that it made good faith reports to AC-CYF that two of its patients had used marijuana during pregnancy and that these reports alone cannot convert it into a state actor implicating constitutional and other claims.  UPMC also contends that it is immune from claims of breach of physician-patient confidentiality because it was required to disclose medical information pursuant to the Pennsylvania Child Protective Services Law ("CPSL").  AC-CYF contends that Plaintiffs' constitutional claims should be dismissed against it because they were never deprived of legal or physical custody of their children, nor were Plaintiffs' relationships with their children and family interfered with in any material sense beyond the investigation itself.  AC-CYF also contends that Plaintiffs' constitutional claims cannot advance in the absence of a municipal policy or custom that violates Plaintiffs' constitutional rights or is

otherwise the moving force behind the constitutional torts committed by individual AC-CYF employees.

## II.  **Standard of Review**

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff; the court must also "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555 (internal citation omitted)).  Moreover, while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal

evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (internal citation omitted)).

## III.   Discussion

Section 1983 functions as a "vehicle for imposing liability against anyone who, under color of state law, deprives a person of 'rights, privileges, or immunities secured by the Constitution and laws.'" *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 525 (3d Cir. 2009) (quoting 42 U.S.C. § 1983). Section 1983 does not create substantive rights by its own terms, but it instead provides remedies for violations of rights that are established elsewhere in the Constitution or in federal law. *See Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir.1996). To establish a claim under Section 1983, two criteria must be met:  1) the conduct complained of must have been committed by a person acting under color of state law; and 2) the conduct must deprive the plaintiff of rights secured under the Constitution or federal law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir.1998).

### A.   Is UPMC a State Actor?

While the parties do not dispute that AC-CYF is a state actor susceptible to claims under Section 1983, Plaintiffs' federal constitutional claims against UPMC at Counts Two, Three, and Five of the Amended Complaint are also predicated on UPMC being a state actor despite it being a non-governmental health care entity.  Plaintiffs allege that UPMC, in coordination with AC-CYF, created and implemented a policy or practice of disclosing to AC-CYF both their and other pregnant labor and delivery patients' confidential medical information concerning self-reported

12

prior drug use or "unconfirmed" positive results of drug tests administered without their knowledge and consent, for the purpose of intruding "into family privacy including upon the birth of a child." (Docket No. 17, ¶¶ 123-129). Plaintiffs also allege that UPMC and AC-CYF infringed upon their private and confidential medical information and discriminated against them based upon sex by subjecting them to drug tests and subsequent child abuse investigations while not subjecting their male partners or other men likely to have custody of a newborn or very young children to such drug tests and investigations. (Docket No. 17, ¶¶ 130-136, 141-152). Plaintiffs assert that UPMC's conduct is state action in violation of the 14th Amendment.

The United States Supreme Court has established multiple approaches for determining whether "'seemingly private behavior may be fairly treated as that of the State itself.'" *Mort v. Lawrence Cnty. Child. and Youth Servs.*, No. 10-1438, 2011 WL 3862641, at *13 (W.D. Pa., Aug. 31, 2011) (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (additional quotation marks and citation omitted). Regardless of which approach[2] is undertaken, the United States Court of Appeals for the Third Circuit directs this Court to "focus on the fact-intensive nature of the state action inquiry, mindful of its central purpose: to 'assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'" *Crissman v. Dover Downs Entertainment Inc.*, 289 F.3d 231, 239 (3d Cir. 2002) (quoting *Brentwood*, 531 U.S. at 295 (emphasis in original)) (additional quotation marks and citation omitted); *see also Benn v. Universal Health System, Inc.*,

---

[2]    These approaches include whether the challenged activity results from the state's exercise of coercive power; whether the state provides significant encouragement, either over or covert; and whether a private party becomes a willful participant in joint activity. *See Mort*, 2011 WL 3862641, at *13 (*citing Brentwood*, 531 U.S. at 296 (collecting cases)); *see also Benn*, 371 F.3d at 171. Such state action may also be found where a nominally private entity is controlled by an agency of the State or when it has been delegated a public function by the state, or when it is entwined with government policies or when government is entwined in its management or control. *See Benn*, 371 F.3d at 171 (citing *Brentwood*, 531 U.S. at 295). It is unclear whether any of these various approaches are different in operation or simply expressive of the "different ways of characterizing the necessarily fact-bound inquiry" this Court is required to undertake. *Mort*, 2011 WL 3862641, at *14 n. 4 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

371 F.3d 165, 171 (3d Cir. 2004) (quoting *Brentwood*, 531 U.S. at 295).   Indeed, the Supreme

Court noted:

> What is fairly attributable [to the State] is a matter of normative judgment, and
> the criteria lack rigid simplicity.   From the range of circumstances that could
> point toward the State behind an individual face, no one fact can function as a
> necessary condition across the board for finding state action; nor is any set of
> circumstances absolutely sufficient, for there may be some countervailing
> reason against attributing activity to the government.

*Brentwood*, 531 U.S. at 295-96.

Here, Plaintiffs contend that UPMC should be deemed a state actor by being a willful

participant in joint activity with AC-CYF.  *See Lugar v. Edmondson Oil, Inc.*, 457 U.S. 922, 941

(1982); *United States v. Price*, 383 U.S. 787, 794 (1966) ("To act 'under color' of law does not

require that the accused be an officer of the State.   It is enough that he is a willful participant in

joint activity with the State or its agents.").   In support of this contention, Plaintiffs allege that in

accordance with past practices, policies, and/or agreements with AC-CYF, UPMC unjustifiably

and in bad faith obtained and disclosed to AC-CYF both their and other patients' confidential

medical information concerning self-reported prior drug use or "unconfirmed" positive results of

surreptitiously conducted drug tests knowing that AC-CYF routinely accepted and acted on

UPMC's disclosures to conduct unwarranted child abuse investigations.   (Docket No. 17, ¶¶ 5, 35,

100-103, 124).

UPMC counters that its actions were limited to reporting marijuana use by pregnant

mothers and that its actions in this regard are akin to a private individual reporting a crime, citing

*Garrett v. Fisher Titus Hosp*. 318 F. Supp. 2d 562, 573 (N.D. Ohio 2004) (holding that

complainants were not acting under the color of law).   UPMC further argues that reporting drug

use to AC-CYF as required by Pennsylvania's Child Protective Services Law ("CPSL"), 23 Pa.

C.S.A. § 6301 *et seq.*, does not make it a state actor, citing several cases supporting this proposition

that private health care providers who report potential child abuse or other crimes to local children's services agencies are not acting under color of law.  *See Boyko v. Parkview Hosp. Inc.,* No. 10-260, 2012 WL 3527373, at *4 (N.D. Ind. Aug. 14, 2012) (granting summary judgment in hospital's favor upon finding that its compliance with mandatory reporting requirements did not render it a state actor); *Mueller v. Auker*, 700 F.3d 1180, 1191-92 (9th Cir. 2012); *Brown v. Newberger*, 291 F.3d 89, 93-94 (1st Cir. 2002); *Thomas v. Beth Israel Hosp. Inc.*, 710 F. Supp. 935, 940-41 (S.D.N.Y. 1989); *Haag v. Cuyahoga County*, 619 F. Supp. 262, 283 (N.D. Ohio 1985); *see also Mort*, 2011 WL 3862641, at *16 (citing *Benn*, 371 F.3d at 172).

Plaintiffs allege that UPMC had no "medical necessity, reason or justification" to report their confidential medical information to any governmental agency such as AC-CYF, and that UPMC's personnel falsely told Plaintiffs that they were legally required to make such reports. (Docket No. 17, ¶¶ 27, 32, 57, 73, 83, 84, 85, 99, 117, 118, 121).  UPMC confirms Plaintiffs' averments that its disclosures to AC-CYF were "for the purpose of carrying out [its] child abuse reporting/investigation responsibilities" under the CPSL.  (Docket No. 19 at 13).  However, in response to Plaintiffs' proffered statutory analysis explaining that the CPSL did not require UPMC to disclose Plaintiffs' confidential medical information to AC-CYF,[3] UPMC replies that a

---

[3]     In their brief, Plaintiffs identify two separate provisions of the CPSL, specifically 23 Pa. C.S. § 6311 (requiring medical professionals to report suspected child abuse) and 23 Pa. C.S. § 6386(a) (amended effective Oct. 2, 2018) (requiring a health care provider who is involved in the delivery or care of an infant who is "born and identified as being affected by . . . illegal substance abuse by the child's mother" or who has "[w]ithdrawal symptoms resulting from prenatal drug exposure" to make a report to the appropriate county agency).  (Docket No. 28 at 4-8). Plaintiffs note that Section 6386 of the CPSL was amended in 2018, and they allege that the version in effect at the time of the events at issue here provided that health care providers involved in the delivery or care of an infant who is "born and identified as being affected by . . . illegal substance abuse by the child's mother" or "[w]ithdrawal symptoms resulting from prenatal drug exposure" must make a report to the appropriate county agency such as AC-CYF.  (Docket No. 28 at 5 (quoting 23 Pa. C.S. § 6386 (amended effective Oct. 2, 2018))).  Plaintiffs allege in their Amended Complaint that UPMC was aware that Plaintiffs' newborn infants were healthy, had no symptoms of withdrawal, and had tested negative for controlled substances and thus UPMC was not required to make a report to AC-CYF because it had no basis to suspect they had been "affected by illegal substance abuse . . . or [w]ithdrawal symptoms resulting from prenatal drug exposure," as expressed in Section 6386(a).

determination of child abuse under the CPSL is a "mere distraction" but it nonetheless does not support or otherwise explain its earlier assertion that the CPSL justified its alleged actions. (Compare Docket No. 19 at 7 and 13 with Docket No. 37 at 1).

Even if Plaintiffs are correct in their assertion that UPMC's generalized reliance on the CPSL was false or otherwise mistaken, UPMC's purportedly misplaced invocation of the CPSL is not enough, standing alone, for Plaintiffs to plausibly allege that UPMC is a state actor. *See Benn*, 371 F.3d at 172. Rather, to survive UPMC's motion to dismiss, Plaintiffs must plead sufficient factual matter, accepted as true, to plausibly contend that UPMC jointly participated in carrying out a state statute or scheme such as when the system or scheme permits private parties to substitute their judgment for that of a state official or body. *See Mort*, 2011 WL 3862641, at *16 (citing *Cruz v. Donnelly*, 727 F.2d 79, 82 (3d Cir. 1984) (stating that "at least when the state creates a system permitting private parties to substitute their judgment for that of a state official or body, a private actor's mere invocation of state power renders that [private] party's conduct actionable [as a joint actor with the state] under § 1983")).

Here, Plaintiffs' allegations go beyond merely averring that UPMC reported crimes it observed or that it made statutorily mandated reports of child abuse. Plaintiffs assert factual allegations that UPMC routinely took affirmative steps in accord with its own policies, customs, and practices, and in violation of its own legal and ethical duties, to obtain confidential medical

---

Plaintiffs also point out that while 23 Pa. C.S. § 6311 requires "mandated reporters," such as UPMC's hospitals, to report "suspected child abuse" if the mandated reporter "has reasonable cause to suspect that a child is a victim of child abuse," UPMC did not have the requisite reasonable cause to suspect child abuse as a matter of law based solely upon a pregnant mother's self-disclosure that she had smoked marijuana in the past or upon a pregnant mother's "unconfirmed" positive drug test result. (Docket No. 28 at 6-7 (citing *In the Interest of L.J.B.*, 199 A.3d 868 (Pa. 2018) (holding that a mother cannot be found to be a perpetrator of child abuse, pursuant to the CPSL, against her newly born child for drug use while pregnant))). Plaintiffs further posit that UPMC had no reason to believe that their healthy newborn babies were victims of "child abuse" as that term is defined in the CPSL at 23 Pa. C.S. § 6303. (*Id.*).

information from its patients and to convey that private information to AC-CYF without its patients' consent as part of a practice, policy or agreement with AC-CYF and knowing that AC-CYF routinely accepted and acted upon UPMC's disclosures to conduct unwarranted, intrusive, coercive, and unconstitutional child abuse investigations, including the possible removal of the mother's newborn child from her custody.  (Docket No. 17, ¶¶ 5, 27, 32, 35, 36, 57, 73, 83, 84, 85, 99, 100-103, 117, 118, 121, 123, 124, 130).  Plaintiffs further allege that, in at least one instance, an AC-CYF caseworker entered Plaintiff Harrington's private hospital room at UPMC's Magee Women's Hospital, shortly after giving birth to her son, unannounced and without consent, and informed her of the impending child abuse investigation, photographed her newborn child, required her to sign various government forms and documents, and notified her that she would be subject to a forthcoming home inspection.  (*Id.* ¶¶ 35-37).  Plaintiffs also allege that AC-CYF encouraged UPMC to continue violating its labor and delivery patients' rights by accepting confidential medical information about patients which it knew UPMC was not privileged or legally required to disclose.  (*Id.* ¶ 131).  And, while UPMC contends that Plaintiffs' averments of an agreement between UPMC and AC-CYF were merely bald assertions that lack any factual backing, in this Court's estimation those allegations do allege a plausible agreement, conspiracy, or coordinated plan between UPMC and AC-CYF, particularly because those allegations permit reasonably drawn inferences that AC-CYF routinely defers to and relies upon UPMC's judgment as to whether, and to what extent, it will conduct child abuse investigations of UPMC's maternity patients even when the CPSL may not mandate UPMC to make such child abuse reports.  Likewise, Plaintiffs' factual allegations also permit a reasonably drawn inference that UPMC intentionally facilitated AC-CYF's intrusions, not only into the patients' private medical information, but also into their private hospital rooms which UPMC undoubtedly governs and in which Plaintiffs allege

17

the patients and their newborn children are captively and coercively interrogated and photographed.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Upon reviewing the detailed factual allegations contained in Plaintiffs' Amended Complaint and the inferences reasonably drawn therefrom and considering the fact-intensive nature of the inquiry required of this Court by the Third Circuit, it is apparent that Plaintiffs sufficiently allege a plausible claim that UPMC was a willful participant in joint activity with AC-CYF to infringe upon Plaintiffs' constitutionally protected rights such that UPMC is a state actor here.  *See Mort*, 2011 WL 3862641, at *15-17; *Bower v. Lawrence Cnty. Children & Youth Servs.*, No. 11-931, 2011 WL 5523712 (W.D. Pa. Nov. 14, 2011).[4]

### B.   Constitutional Violations Caused by a Policy or Custom

Plaintiffs allege that Defendants are state actors who are liable for constitutional violations caused by a policy or custom in accordance with *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *See also Est. of Roman v. City of Newark*, 914 F.3d 789, 798-99 (3d Cir. 2019).

Plaintiffs must allege more than violations of their rights caused by an AC-CYF or UPMC employee; Plaintiffs must also sufficiently plead that those alleged violations are *attributable to* AC-CYF and UPMC.  Defendants "cannot be held liable *solely* because [they] employ[] a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.'"  *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 197-98 (3d Cir. 2018) (quoting *Monell*, 436 U.S. at 691) (emphasis in original).  Thus, the alleged violation of rights must have been caused by actions that were taken pursuant to a municipal "policy" or "custom."

---

[4]      UPMC urges the Court to rely upon a later decision granting summary judgment in *Bower* to grant its motion to dismiss here.  *See Bower*, 964 F. Supp. 2d 475, 488 (W.D. Pa. 2013).  While it remains to be seen whether Plaintiffs can elicit and proffer evidence in support of their allegations that UPMC is a state actor, Plaintiffs have alleged enough at this juncture to survive UPMC's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

*See id.* at 198 (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003));
*see also Monell*, 436 U.S. at 690-94.  Liability is imposed "when the policy or custom itself violates
the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving
force' behind the constitutional tort of one of its employees."  *Colburn v. Upper Darby Twp.*, 946
F.2d 1017, 1027 (3d Cir.1991) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).

"A policy is made 'when a decisionmaker possess[ing] final authority to establish
municipal policy with respect to the action issues a final proclamation, policy or edict.'"  *Natale*,
318 F.3d at 584 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).  Acts by an
employee may be deemed to be the result of a policy of the entity for whom the employee works
in three situations: (1) where "the individual acted pursuant to a formal government policy or a
standard operating procedure long accepted within the government entity;" (2) where "the
individual himself has final policy-making authority such that his conduct represents official
policy;" or (3) where "a final policy-maker renders the individual's conduct official for liability
purposes by having delegated to him authority to act or speak for the government, or by ratifying
the conduct or speech after it has occurred."  *Hill v. Borough* of *Kutztown*, 455 F.3d 225, 245 (3d
Cir. 2006); *Jones v. Pittston Area Sch. Dist.*, No. 18-1919, 2021 WL 3673840, at *5 (M.D. Pa.
Aug. 18, 2021).  A "custom," on the other hand, involves "'practices of state officials . . . so
permanent and well settled as to constitute a "custom or usage" with the force of law.'"  *Monell*,
436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

Plaintiffs allege that AC-CYF created and maintained a policy or custom of investigating
new mothers based solely on reports of their prenatal marijuana use made by UPMC.  Plaintiffs
also allege that, in accordance with past practices, policies, and/or agreements with AC-CYF,
UPMC unjustifiably and in bad faith disclosed to AC-CYF both their and other labor and delivery

19

patients' confidential medical information concerning self-reported prior drug use or "unconfirmed" positive results of drug tests of a provisional and uncertain nature, knowing that AC-CYF routinely accepted and acted on UPMC's reports as a substitute for its own judgment. (Docket No. 17, ¶¶ 5, 35, 100-103, 124). Plaintiffs also allege that AC-CYF encouraged UPMC to continue violating its patients' rights by accepting such confidential medical information about its patients which it knew UPMC was not privileged or legally required to disclose. (*Id.* ¶ 131). Additionally, Plaintiffs have pled specific factual averments evincing that AC-CYF's case workers were operating in accord with policies or customs or at the direction of its policymakers. For instance, Plaintiffs allege that caseworker Grant Walker informed Harrington that whenever UPMC reported a new mother's "unconfirmed" positive drug test to AC-CYF, AC-CYF routinely accepted and acted on this confidential information and would open an investigation, require participation in a drug counseling session with POWER, require submission of monthly drug tests, and ultimately follow POWER's recommendation. (*Id.* ¶¶ 36-37, 45, 52). Finally, Plaintiffs allege that UPMC willfully participated in joint activity with AC-CYF to establish or administer these policies, agreements, or practices that are alleged to directly abridge Plaintiffs' constitutional rights. (*Id.* ¶¶ 1, 5, 99-107, 124, 125, 130, 131, 138, 141, 143, 144, 147, 154, 158).

When read in a light favorable to Plaintiffs as the non-movants here, the averments set forth in the Amended Complaint allege that AC-CYF used UPMC as a form of "cat's paw"[5] to undertake inquiries and to administer drug tests on UPMC's labor and delivery patients without their consent, and then to use reports of those ostensibly private and confidential medical inquiries and "provisional and uncertain" test results as a predicate to launch unwarranted and unconstitutional child abuse investigations.

---

[5]     *See, e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1, 419 (2011) (discussing the term, a "cat's paw" case).

Based upon the foregoing, the Court holds that Plaintiffs plausibly pled the existence of a deliberately indifferent policy or custom that caused constitutional deprivations sufficient to state facially plausible Section 1983 claims against AC-CYF and UPMC.[6]  *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Accordingly, Defendants' motions to dismiss are denied to the extent that Defendants seek the dismissal of Plaintiffs' constitutional claims based on a failure to plead municipal liability under *Monell*.

C.    **Infringement of Plaintiffs' Familial Integrity in Violation of the Due Process Clause of the Fourteenth Amendment**

In Count Two of their Amended Complaint, Plaintiffs allege claims against UPMC and AC-CYF pursuant to Section 1983 for violations of their substantive due process rights, under the Fourteenth Amendment to the United States Constitution, to be free from government intrusion "into family privacy including upon the birth of a child."  (Docket No. 17, ¶¶ 123-129).

The "private realm of family life" is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.  *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977); *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 499 (1977); *Prince v.*

---

[6]    Plaintiffs also allege that AC-CYF failed to train or discipline its caseworkers.  In such instances, liability under Section 1983 "requires a showing that the failure [to train] amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact."  *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)).  "Ordinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'"  *Id*. at 223 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).  However, there are certain situations in which "the need for training 'can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights' even without a pattern of constitutional violations."  *Id.* at 223 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (additional citation omitted)).  Plaintiffs allege that in at least one prior instance, a former UPMC labor and delivery patient asserted similar claims that ultimately "resolved," and that Defendants knew that such policies, practices, and/or agreements abridged patients' constitutional rights, yet their personnel were not subsequently trained to avoid future constitutional abridgments of this sort.  (Docket No. 17, ¶ 99).  The Court finds that Plaintiffs sufficiently pled such a claim at this juncture, although barely, pursuant to Fed. R. Civ. P. 12(b)(6).

*Massachusetts*, 321 U.S. 158, 166 (1944).[7]  The United States Supreme Court has explained that it is "a cardinal principal 'that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'"  *Lehr v. Robertson*, 463 U.S. 248, 257-58 (1983) (quoting *Prince*, 321 U.S. at 166).  The "importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promot[ing] a way of life through the instruction of children as well as from the fact of blood relationship.'"  *Id.* at 261 (quoting *Smith*, 431 US. at 844 (additional quotation marks and citation omitted)).  Accordingly, parents have constitutionally protected liberty interests in the custody, care, and management of their children.  *See Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997).  Indeed, the "Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process."  *Id*.

While familial integrity is a liberty interest entitled to constitutional protection, such protection is not absolute.  *See Croft*, 103 F.3d at 1125.  Rather, it is "limited by the compelling governmental interest in the protection of children[8] – particularly where the children need to be protected from their own parents" and does not include a right to remain free from child abuse investigations.  *Id*.  In determining whether such constitutionally protected interests were violated, the Court "must balance the fundamental liberty interests of the family unit with the compelling

---

[7]      This constitutional right is derived "'not in state law, but in intrinsic human rights, as they have been understood in this Nation's history and tradition.'"  *Duchesne as Administratrix of the Estate of Pauline Perez v. Sugerman*, 566 F.2d 817, 824-25 (2d Cir. 1977) (quoting *Smith*, 431 U.S. at 845 (additional quotation marks and citation omitted)).

[8]      The Supreme Court has held that "[t]he government may use its voice and its regulatory authority to show its profound respect for the life within the woman."  *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) Moreover, "[r]espect for human life finds an ultimate expression in the bond of love the mother has for her child."  *Id*. at 159.

interests of the state in protecting children from abuse." *Id*. at 1125.  The State "has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id*. at 1126.  Absent "information available to the defendants at the time [that] would have created an objectively reasonable suspicion of abuse justifying the degree of interference[,]" such governmental intrusion would be an unconstitutional "arbitrary abuse[] of power." *Id*.

Plaintiffs' allegations plausibly cast doubt on whether AC-CYF and UPMC, as a joint actor with AC-CYF, possessed the requisite objectively reasonable suspicion of abuse to justify both the initiation and degree of governmental interference with Plaintiffs' familial relationships.  As pled by Plaintiffs, Defendants merely possessed information that Cook ceased using marijuana several months beforehand when she found out she was pregnant, that she tested negative for drugs with "no current concerns" upon admission to the hospital for childbirth, and that her newborn also tested negative for drugs immediately after birth.  (Docket No. 17, ¶¶ 91-97).  Similarly, as pled in the Amended Complaint, Defendants merely possessed Harrington's "unconfirmed positive" drug test result that included the express qualifiers that such result is 'to be used only for medical purposes" (and not for non-medical purposes such as employment testing and legal testing) and that the test administered "may react with compounds other than the drugs indicated, and therefore are not definitive."  (*Id.* ¶¶ 19-22, 31-40).  Yet, with nothing more, Defendants seemingly disregarded the presumption articulated by the Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 69 (2000), that a "fit parent will act in the best interest of his or her child" and instead intruded into and interfered with Plaintiffs' constitutionally protected liberty interests in their familial integrity.  Here, the Court finds that Plaintiffs sufficiently pled facts regarding Defendants alleged lack of an objectively reasonable suspicion of abuse to meet the threshold set by *Twombly* and

*Iqbal*.  In reaching this decision, the Court is mindful both of liberal pleading standards and its obligation to accept all factual allegations in the Amended Complaint as true and to draw all inferences therefrom in favor of Plaintiffs.

Defendants point to *Croft* and contend that Plaintiffs' rights to the custody, care, and management of their children were not infringed upon merely by being subjected to child abuse investigations.  *See Croft*, 103 F.3d at 1125-26 ("disruption or disintegration of family life" due to a child abuse investigation "does not, *in and of itself*, constitute a constitutional deprivation") (emphasis added) (citing *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993)).  However, while *Croft* did hold that the fundamental right to familial integrity does not include a right to remain free from child abuse investigations *in and of themselves*, such investigations do not escape constitutional scrutiny when initiated, expanded, or continued in the absence of reasonable grounds and thus become arbitrary abuses of power.  *See Croft*, 103 F.3d at 1126 (stating that "[o]ur focus here is whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference"); *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003).  Here, Plaintiffs allege that the putatively unwarranted and unjustified child abuse investigations began when UPMC personnel administered drug tests on Plaintiffs and their newborns without their knowledge or consent, and were subsequently exacerbated by governmental intrusions into their hospital rooms and homes under coercive circumstances that created a belief that they would lose child custody, all without any objectively reasonable suspicion of abuse or despite any errant suspicion being dispelled.

Plaintiffs also allege intrusions beyond being subject to child abuse investigations.  They allege that they were coerced into signing various AC-CYF forms and documents, including releases permitting AC-CYF to obtain confidential information from their young children's

pediatricians, dentists, and schools.  (Docket No. 17, ¶¶ 53, 54, 55, 63, 64, 65, 92, 97).  Plaintiffs

also allege that AC-CYF insisted upon additional drug testing and/or drug counseling and imposed

unneeded and unwanted parental advice and instruction.  (*Id.* ¶¶ 45, 47, 49, 60, 92).  Plaintiffs also

allege that at least one such investigation involving Cook triggered numerous phone calls from

social services agencies offering unnecessary services.   (*Id.* ¶ 94).   Indeed, these averments

plausibly contend that the investigations were unjustified *ab initio*, expanded and persisted without

any legitimate predicate and despite objective evidence of non-abuse, and transgressed beyond

investigative fact gathering.

Defendants nonetheless contend that parents' fundamental liberty interest in the care,

custody, and management of their children is not implicated by conduct short of actual separation

of parent and child.  Defendants cite several district court decisions in support of this contention.

*See, e.g., A.J. v. Lancaster County*, No. 19-1768, 2019 WL 7161686, at *3 (E.D. Pa. Dec. 23,

2019) (citing cases); *Billups v. Penn State Milton S. Hershey Med. Ctr.* 910 F. Supp. 2d 745, 758-

59 (M.D. Pa. 2012); *Coleman v. State of New Jersey Div. of Youth & Family Servs.*, 246 F. Supp.

2d 384, 390 (D.N.J. 2003); *Rinderer v. Delaware Cnty. Child. & Youth Servs.*, 703 F. Supp. 358,

361 (E.D. Pa. 1988).   However, while the Court acknowledges that these cases draw the line of

constitutional deprivation at the point where parent and child are separated, the Court notes that

one such case cited by UPMC, *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, a

qualified immunity case, found "no consensus of authority that temporarily removing a child . . .

violates substantive due process."  814 F.3d 164, 170 (3d Cir. 2016).[9]

This Court has found no controlling Third Circuit authority requiring physical separation

of parent and child.  Rather, in *Croft*, the Third Circuit seems to tether the "degree of interference"

---

[9]        The Court in *Mammaro* also distinguished its facts from those in *Croft*.  *See* 814 F.3d 170-71.

necessary for establishing a constitutional deprivation to the "objectively reasonable suspicion of abuse justifying" such interference, and therefore suggests a continuum rather than a bright line. *Croft*, 103 F. 3d at 1126.  Here, even though Plaintiffs do not allege a physical separation of parent and child, they do plausibly allege that these purportedly unjustified actions interfered with their familial integrity, particularly the delicate and intense relational bond emerging between mother (and father) and newborn immediately before, during, and after childbirth.[10]

Accordingly, Defendants' motions to dismiss are denied to the extent that they seek the dismissal of Count Two of the Amended Complaint alleging infringements of Plaintiffs' familial integrity in violation of the Due Process Clause of the Fourteenth Amendment.

### D.  Infringement of Plaintiffs' Private and Confidential Medical Information in Violation of the Due Process Clause of the Fourteenth Amendment

In Count Three of their Amended Complaint, Plaintiffs allege that UPMC and AC-CYF infringed upon their private and confidential medical information in violation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution.  (Docket No. 17, ¶¶ 130-36).

There exists a constitutionally protected privacy interest in "'avoiding disclosure of personal matters'" such as medical records "which may contain intimate facts of a personal nature." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) (quoting

---

[10]     AC-CYF's contention that the "inconvenience and emotional distress of being the subject of a child abuse investigation is far outweighed by the risk of actual child abuse going undiscovered and unremedied," (Docket No. 21 at 15), standing alone, ignores its constitutional obligation to predicate any such investigation on an objectively reasonable suspicion of child abuse available to it at the time of the alleged familial interference.  Furthermore, to the extent Defendants are challenging the materiality of the alleged interference, it will be more apt to analyze that issue on a more developed evidentiary record.  Finally, Defendants contend that Plaintiffs' allegations do not reflect conduct that "shocks the conscience."  (Docket No. 21 at 14-15).  Yet the "degree of wrongfulness needed to satisfy the 'conscience-shocking' standard depends upon the circumstances of the particular case. . . . [Thus], deliberate indifference or even arbitrary action may rise to the required level in one setting and fall short in another." *Mort*, 2011 WL 3862641, at *8.  Again, as discussed *supra*, in reaching this decision, the Court is mindful both of liberal pleading standards and its obligation to accept all factual allegations in the Amended Complaint as true and to draw all inferences therefrom in favor of Plaintiffs when evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

*Whalen v. Roe*, 429 U.S. 589, 599 (1977)).  "Information about one's body and state of health is matter which the individual is ordinarily entitled to retain within the 'private enclave where he may lead a private life.'"  *Westinghouse Elec. Corp.*, 638 F.2d at 577 (quoting *United States v. Grunewald*, 233 F.2d 556, 581-82 (2d Cir. 1956) (Frank, J., dissenting)).  However, the right to avoid disclosure of personal matters is not absolute and courts allow "some intrusion into the zone of privacy surrounding medical records . . . after finding that the societal interest in disclosure outweighs the privacy interest on the specific facts of the case."  *Id.* at 578.

The Third Circuit has identified seven factors to consider when deciding whether an intrusion into an individual's privacy is justified.  These factors are:

[1]     the type of record requested,

[2]     the information it does or might contain,

[3]     the potential for harm in any subsequent nonconsensual disclosure,

[4]     the injury from disclosure to the relationship in which the record was generated,

[5]     the adequacy of safeguards to prevent unauthorized disclosure,

[6]     the degree of need for access, and

[7]     whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Westinghouse Elec. Corp.*, 638 F.2d at 578.  The first five factors account for the individuals' privacy expectations, while the final two factors account for the governmental interest in disclosure.  *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 181 (3d Cir. 2005).

Here, Plaintiffs essentially allege that UPMC secretly obtained their and their newborns' personal, intimate medical information and then divulged that information to AC-CYF for the purpose of pursuing unwarranted child abuse investigations and other impositions on their familial relationships.  Plaintiffs also allege that the medical information at issue is very specific and

27

personally identifiable.  Plaintiffs further allege that this highly personal information was obtained in contravention of their reasonable privacy expectations inherent in their trusted physician-patient relationships, and, even then, it was taken and then divulged to the government and other third parties without their knowledge or consent.  Under these circumstances, it is reasonable to infer that such purported breaches of trust caused by Defendants' alleged invasions of privacy erode these vitally important relationships between maternity patients such as Plaintiffs and their medical providers.  These alleged circumstances must then be weighed against the legitimate and important governmental interest in disclosing and using such private medical information to protect children from abuse.  Here, there are express statutory mandates, notably the CPSL and the Health Insurance Portability and Accountability Act ("HIPAA"), that provide the contours for when and to what degree such information may be reported by UPMC and used by AC-CYF.  At this preliminary juncture, however, Plaintiffs have pled enough to plausibly tip the balance of these factors towards establishing viable constitutional privacy claims.

Accordingly, Defendants' motions to dismiss are denied to the extent that they seek the dismissal of Count Three of the Amended Complaint alleging infringements of Plaintiffs' private and confidential medical information in violation of the Due Process Clause of the Fourteenth Amendment.

### E.  Compelled Speech in Violation of the First Amendment

At Count Four of the Amended Complaint, Plaintiff Harrington alleges a claim against AC-CYF for violating her First Amendment right to be free from compelled speech.  (Docket No. 17, ¶¶ 45-48, 137-140).  In furtherance of this claim, Harrington contends that AC-CYF threatened to report her to a judge and require her to submit to monthly drug tests, without justification, unless

she answered a series of questions about her personal life through mandated participation in the POWER program.  (*Id.*).

The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech, which "includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. American Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, . . . a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Janus*, 138 S. Ct. at 2464 (quoting *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)); *see also Turner Broad. Sys. Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622 (1994) (applying intermediate level of scrutiny to content-neutral restrictions with incidental burden on speech).

Harrington does not appear to be contending that AC-CYF sought to compel involuntary affirmation of objected-to beliefs or to embrace a particular government-favored message.  In fact, Harrington's threadbare averments supporting her free speech claim offer no specifics as to what speech, if any, she contends had been coerced.  Rather, as pled, Harrington narrowly alleges that AC-CYF threatened to report her to a judge and require her to submit to monthly drug tests unless she answered a series of questions about her "personal life."  (Docket No. 17, ¶ 137).  While the Court finds that the Amended Complaint does contain adequate factual averments to plausibly establish the requisite compulsion, *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005), the Court also concludes that the Amended Complaint is devoid of allegations as to what

POWER's questions entailed, and thus the Court cannot assess whether to apply strict or intermediate scrutiny, much less discern whether those questions pass constitutional muster.[11]

Accordingly, AC-CYF's motion to dismiss is granted to the extent that it seeks the dismissal of Count Four of the Amended Complaint.  Count Four is dismissed without prejudice.

F. **Discrimination Based on Sex in Violation of the Equal Protection Clause of the Fourteenth Amendment**

In Count Five of their Amended Complaint, Plaintiffs allege that UPMC and AC-CYF violated their rights under the Equal Protection Clause of the 14th Amendment by jointly effectuating a policy or practice of collecting information from new mothers regarding their prior drug use, but not having or implementing a corresponding policy or practice of collecting such information about prior drug use by their male partners or other similarly situated men likely to have custody of a newborn or very young children.  (Docket No. 17, ¶¶ 28, 81, 86-87, 141-52).

Under the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection Clause directs that all persons similarly situated should be treated alike.  *See Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005).  To state a cognizable claim for denial of equal protection, Plaintiffs must allege that (i) they received different treatment from that received by other individuals similarly situated, and (ii) to prove sexual discrimination, that this disparate treatment was based upon their gender.  *See id.*  "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'"  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) (quoting *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008)).

---

[11]     The Court notes, too, that Defendants' briefs do not specifically address Harrington's First Amendment claim.

In their Amended Complaint, Plaintiffs allege that Harrington's husband was present at the hospital prior to and during childbirth and intended to return home with Harrington and their newborn, but UPMC did not collect or attempt to collect his urine to test it for drugs.  (Docket No. 17, ¶ 28).  Likewise, Plaintiffs allege that the father of Cook's newborn was also present at the hospital during childbirth and similarly intended to return home with Cook and their newborn, yet UPMC never attempted to collect his urine to test it for drugs nor did UPMC asked whether he had ever used illegal drugs.  (*Id.* ¶¶ 81, 86-88).  Plaintiffs do not allege that either of these fathers were patients themselves.

UPMC asserts that Plaintiffs and the fathers of their newborns are not similarly situated because Plaintiffs were its patients during all stages of labor, delivery, and recovery, while the fathers were not; because a mother's use of drugs, whether prescribed or illicit, can directly affect the health of her child biologically both before and after birth; and because the CPSL, as in effect at the time at 23 Pa. C.S. § 6386(a) (amended effective Oct. 2, 2018), required hospitals to distinguish between mothers and fathers for purposes of reporting based on mothers' drug use. AC-CYF further contends that Plaintiffs and the fathers of their newborns are not similarly situated because AC-CYF possessed some information about the suspected drug use of Plaintiffs but no such information about the fathers for purposes of investigating suspected child abuse.  Plaintiffs respond by arguing that such disparate treatment is based on "unfounded concerns" that marijuana use will interfere with their ability to care for their newborns.  Plaintiffs further argue that the disparate treatment is also based on outdated and improper assumptions about the roles of men and women in raising children.[12]  The Court agrees with Defendants' explanations for why Plaintiffs

---

[12]     Plaintiffs' Amended Complaint is devoid of any averments regarding gender stereotypes.

and the fathers are not similarly situated and finds Plaintiffs' arguments to the contrary to be unavailing.

One of Plaintiffs' core allegations in this case is that UPMC, as a willful participant in joint activity with AC-CYF, breached its duty of physician-patient confidentiality by reporting Plaintiffs' private medical information to AC-CYF. Plaintiffs were UPMC's labor and delivery patients, while the fathers were not. UPMC obtained Plaintiffs' private medical information, including prior purported drug use, in the context of their physician-patient relationship during labor, delivery, and recovery from childbirth. Plaintiffs have not and presumably cannot allege any corresponding physician-patient relationship between the fathers and UPMC's obstetricians and their labor and delivery service. Moreover, there is a fundamental biological distinction between a mother and father regarding the substances they consume (both legal and illicit) and the potentially deleterious impact those substances may have on their child's health and wellbeing both *in utero* and upon birth. The CPSL recognized this reality by imposing specified reporting obligations on hospitals based on mothers' drug use but not fathers' drug use. These inherent differences between mothers and fathers are substantial in the context of prenatal care, labor, delivery, and recovery, and principles of equal protection do not require ignoring this reality. *See Tuan Anh Nguyen v. Immigr. & Naturalization Serv.*, 533 U.S. 53, 66 (2001). Furthermore, AC-CYF undertook investigations based upon reports that Plaintiffs, but not the fathers, illegally used drugs. Therefore, based upon the averments contained in the Amended Complaint and reasonable inferences drawn therefrom in Plaintiffs' favor, the Court finds that Plaintiffs have not alleged a cognizable equal protection claim and that they cannot plausibly allege additional facts by amendment to allege Plaintiffs and the fathers were similarly situated to establish such a claim.

Accordingly, Defendants' motions to dismiss are granted to the extent that they seek the dismissal of Count Five of the Amended Complaint.  Those claims are dismissed with prejudice.

### G.   AC-CYF's Drug Test of Harrington in Violation of the Fourth Amendment

At Count Six, Harrington asserts a claim against AC-CYF alleging that it violated the Fourth Amendment by requiring her to submit to drug tests based solely on a hospital report of an unconfirmed positive test for marijuana while pregnant and without any basis to believe that she abused or neglected her children.[13]

AC-CYF argues that Harrington voluntarily consented to drug testing.  *See Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) (stating that "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so").  Accordingly, AC-CYF has the burden to establish that Harrington's consent to be tested was freely and voluntarily given.  *See United States v. Price*, 558 F.3d 270, 277-78 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).  "This burden 'is not satisfied by showing a mere submission to a claim of lawful authority.'"  *Id.* at 278 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)).

The Supreme Court instructs that there is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973).  Rather, courts must determine voluntariness of consent by examining the totality of the circumstances.  *See Price*, 558 F.3d at 278.  Harrington avers that her consent was not voluntary because of the purportedly coercive timing, setting, and nature of the AC-CYF case worker's directives that she must submit to subsequent drug tests.  Harrington was subjected to this child abuse investigation immediately upon giving birth, while still in the

---

[13]     Plaintiffs also argue that AC-CYF lacked statutory authorization under the CPSL to require drug testing, citing *In the Interest of D.R.*, 232 A. 3d 547, 558-59 (Pa. 2020) (holding that child welfare agency's statutory authority to investigate under the CPSL does not include the authority to obtain an involuntary urine sample from the subject of the investigation).

hospital, and while under the belief that her infant newborn would be taken away from her if she refused or otherwise failed to cooperate.  Under the totality of the circumstances, these averments plausibly allege that Harrington did not voluntarily consent to such drug tests, and AC-CYF will need to proffer evidence during discovery to satisfy its burden to the contrary.

Accordingly, AC-CYF's motion to dismiss is denied to the extent that it seeks the dismissal of Count Six of the Amended Complaint alleging a violation of Harrington's Fourth Amendment rights.

### H.   Infringement of Harrington's Right to Privacy in Violation of the Pennsylvania Constitution

At Count Seven of the Amended Complaint, pursuant to the Court's supplemental jurisdiction, Harrington asserts a claim against AC-CYF alleging that it required her to submit to a urine drug test in violation of her right to privacy under Art. I, Sec. 8, of the Pennsylvania Constitution.  (Docket No. 17, ¶¶ 157-59).  AC-CYF seeks to dismiss this claim insofar as Plaintiffs seek monetary damages derived from violations of the Pennsylvania Constitution. Plaintiffs do not address this issue in their briefing.

The Pennsylvania Commonwealth Court has held that "'neither Pennsylvania statutory authority, nor appellate case law has authorized the award of monetary damages for a violation of the Pennsylvania Constitution.'"  *Kornegay v. City of Philadelphia*, 299 F. Supp. 3d 675, 685 (E.D. Pa. 2018) (quoting *Jones v. City of Philadelphia*, 890 A.2d 1188, 1208 (Pa. Commonw. Ct. 2006)). While the Pennsylvania Supreme Court has not specifically addressed the issue, federal courts have adhered to the reasoning of the Commonwealth Court in refusing to recognize such claims for money damages.  *See id.* at 685 n. 54 (citing various cases).

Accordingly, AC-CYF's motion to dismiss is granted to the extent that it seeks the dismissal of a request for monetary damages in Count Seven based on alleged violations of the

Pennsylvania Constitution.  Any such request for relief in Count Seven is dismissed with prejudice, thus limiting the request for relief in Count Seven to non-monetary relief only.

    **I.**   **Breach of Common Law Duty of Physician-Patient Confidentiality**

Finally, at Count One of the Amended Complaint, pursuant to the Court's supplemental jurisdiction, Plaintiffs assert claims against UPMC for purportedly breaching its common law duty to keep all patient communications, diagnoses, and treatment information confidential.  (Docket No. 17, ¶¶ 116-122).  UPMC seeks dismissal of these claims contending that its alleged disclosures to AC-CYF were made in good faith, and it therefore is immune from liability pursuant to the CPSL, citing 23 Pa. C.S. § 6318(a)(1).

Because good faith is presumed, 23 Pa. C.S. § 6318(c), Plaintiffs must allege sufficient facts to plausibly establish that UPMC acted in bad faith.  *See Heinrich v Conemaugh Valley Mem'l Hosp.*, 648 A.2d 53, 57-59 (Pa. Super. Ct. 1994).   In this regard, Plaintiffs aver that UPMC administered drug tests without consent and then disclosed the "unconfirmed" results of those tests along with other confidential medical information to AC-CYF, despite knowing these tests were unreliable and likely to lead to false positive results.  (Docket No. 17, ¶¶ 19-22).  Plaintiffs also aver that UPMC's testing of Plaintiffs' newborns without their consent nonetheless resulted in negative results, and that UPMC possessed no countervailing information that would lead those involved in the delivery or care of these healthy infants to believe that they were affected by illegal substance abuse of their mothers or that they exhibited withdrawal symptoms resulting from prenatal drug exposure.  (*Id*. ¶¶ 23-26, 29- 32, 80, 82-83).  In one such alleged instance, UPMC personnel allegedly disclosed Harrington's confidential medical information to AC-CYF despite her newborn's negative drug test result and indications that the infant was "in good health."  (*Id.* ¶ 31).  In another instance, UPMC personnel allegedly disclosed Cook's confidential medical

information to AC-CYF even though both her and her newborn's drug tests were negative,[14] and even though UPMC had "no current concerns."  (*Id.* ¶ 85).  Based upon these averments, the Court finds that Plaintiffs sufficiently pled facts to raise a reasonable expectation that discovery will reveal evidence of bad faith to overcome the good faith presumption warranting immunity.  *See Phillips*, 515 F.3d at 234.

Accordingly, UPMC's motion to dismiss is denied to the extent that it seeks the dismissal of Count One of Plaintiffs' Amended Complaint.

## IV.    Conclusion

For the reasons set forth above, Defendants' Motions to Dismiss pursuant to Rule 12(b)(6) are GRANTED IN PART AND DENIED IN PART.  Counts Four and Five of the Amended Complaint are dismissed for failure to state a claim upon which relief can be granted.  Count Four is dismissed without prejudice to amendment with sufficient facts to state a claim upon which relief can be granted, and Count Five is dismissed with prejudice.  To the extent that Harrington requests monetary damages in Count Seven, such request for relief is also dismissed with prejudice for failure to state a claim upon which relief can be granted, thus limiting the request for relief in Count Seven to non-monetary relief only.  Defendants' motions are denied in all other respects.

An appropriate Order will follow.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated:  May 20, 2022

cc/ecf:  All counsel of record

---

[14]     In this instance, Cook admitted to hospital personnel that she previously used illegal drugs, but "'quit everything'" when she found out she was pregnant.  (Docket No. 17, ¶ 71).  However, the Pennsylvania Supreme Court has held as a matter of law that a mother's act of ingesting illegal drugs while pregnant does not constitute child abuse.  *See In the Interest of L.J.B.*, 199 A.3d 868, 877 (Pa. 2018).